Argued and submitted March 4, at the Lewis & Clark School of Law, Portland, Oregon; decision of Court of Appeals reversed, judgment of circuit court reversed, and case remanded to circuit court for further proceedings consistent with this opinion November 15, 2019

STATE OF OREGON,
*Respondent on Review,*

*v.*

MARIO ARREOLA-BOTELLO,
*Petitioner on Review.*

(CC C151713CR) (CA A161566) (SC S066119)

451 P3d 939

An officer stopped defendant for changing lanes and turning without a signal, and, during the stop, asked defendant questions about contraband and for consent to search the vehicle. Defendant consented, the officer discovered drugs, and defendant was charged with possession of a controlled substance. Defendant moved to suppress the evidence, but the trial court declined to do so, concluding that the officer's inquiries had been permissible because they occurred during an "unavoidable lull." The Court of Appeals affirmed. *Held*: (1) Article I, section 9, of the Oregon Constitution requires that all investigative inquires during a traffic stop be reasonably related to the purpose of the stop or have independent constitutional justification; (2) the officer's inquiries were not reasonably related to the purpose of the stop; and (3) defendant was therefore unlawfully seized, and the trial court erred in not suppressing the evidence discovered during that unlawful seizure.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings consistent with this opinion.

En Banc

On review from the Court of Appeals.*

Joshua B. Crowther, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender.

David B. Thompson, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

_____

* On appeal from Washington County Circuit Court, D. Charles Bailey, Jr., Judge. 292 Or App 214, 418 P3d 785 (2018).

Rosalind M. Lee, Eugene, filed the brief for *amici curiae* Oregon Criminal Defense Lawyers Association and Oregon Justice Resource Center.

NELSON, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings consistent with this opinion.

Garrett, J., dissented and filed an opinion, in which Balmer, J., joined.

**NELSON, J.**

In this criminal case, we consider the constitutionally permissible scope of a traffic stop under Article I, section 9, of the Oregon Constitution. Defendant was lawfully stopped for failing to signal a turn and a lane change. During the stop, while defendant was searching for his registration and proof of insurance, the officer asked him about the presence of guns and drugs in the vehicle, and requested consent to search the vehicle. Defendant consented, and during the search, the officer located a controlled substance. Defendant contends that the officer expanded the permissible scope of the traffic stop when he asked about the contents of the vehicle and requested permission to search it because those inquiries were not related to the purpose of the stop. For the reasons that follow, we agree with defendant that the trial court erred in denying defendant's motion to suppress, and we reverse the decision of the Court of Appeals.

In reviewing the denial of a motion to suppress evidence, we are bound by the trial court's factual findings to the extent that those findings are supported by evidence in the record. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991). Additionally, "if the trial court does not make findings on all pertinent historical facts and there is evidence from which those facts could be decided more than one way, we will presume that the trial court found facts in a manner consistent with its ultimate conclusion." *Id.* at 127. We state the following facts in accordance with that standard.

Officer Faulkner of the Beaverton Police Department observed defendant's vehicle change lanes and turn without signaling. Faulkner initiated his patrol car's overhead lights, and defendant pulled over. Faulkner approached defendant's vehicle and requested his driver's license, registration, and proof of insurance. Defendant was able to immediately produce his license but spent about three to four additional minutes searching for his registration and proof of insurance.

While defendant was searching, Faulkner asked him questions. Defendant, who primarily speaks Spanish, was having difficulty understanding the questions in English. At the beginning of the traffic stop, a passenger

in the vehicle helped interpret Faulkner's questions, but she left after Faulkner told her that she was free to do so. Faulkner asked defendant about the presence of weapons, drugs, or other illegal items in the vehicle and requested consent to search the vehicle. Defendant responded, "Sure, okay," and consented to the search.[1] During the search, Faulkner located a small package on the floor between the driver's seat and the door. Faulkner examined the package, found it to be consistent with drug packaging, and observed a substance in the package that he believed was methamphetamine. Faulkner placed defendant under arrest.

The state charged defendant with possession of methamphetamine, ORS 475.894. Before trial, defendant moved to suppress the evidence obtained during the traffic stop, arguing that Faulkner had violated his constitutional rights by unlawfully expanding the scope of the lawful traffic stop into matters unrelated to the purpose of the stop, such as whether defendant possessed drugs. Faulkner testified that his questioning had been a routine inquiry, "[a]ll the same spiel every time." He stated,

> "Every time I walk up, I ask him, I [say], 'hey, Officer Faulkner, Beaverton Police Department,' do my contact with them. 'Do you have anything illegal in the car? Would you consent to a search for guns, drugs, knives, bombs, illegal documents, or anything else that you're not allowed to possess?'"

Defendant maintained that Faulkner's questioning went beyond the lawful the scope of the traffic stop. The trial court disagreed and concluded that Faulkner had asked the unrelated questions during an "unavoidable lull,"[2] and

---

[1] The record from the suppression hearing is unclear about whether that line of questioning occurred before or after the translating passenger left the scene, but, during the later bench trial, Faulkner testified that the passenger had already left before defendant had authorized consent to search. No issue is raised on review concerning defendant's understanding of Faulkner's request.

[2] As explained below, the Court of Appeals has held that, during an "unavoidable lull," an officer may ask unrelated questions during a traffic stop if those questions do not extend the duration of the stop. *See State v. Nims*, 248 Or App 708, 713, 274 P3d 235 (2012) (so stating); *see also State v. Gomes*, 236 Or App 364, 372, 236 P3d 841 (2010) (concluding that an officer's unrelated inquiries did not violate constitutional protections because they occurred simultaneously with activities related to the traffic stop and did not extend its duration). This court has not previously addressed that line of reasoning.

that defendant had voluntarily consented to the search of the vehicle. Thus, the trial court denied defendant's motion to suppress. Defendant waived his right to a jury trial, and the trial court convicted defendant of unlawful possession of methamphetamine.

Defendant appealed, assigning error to the denial of his motion to suppress. At the Court of Appeals, defendant argued that Faulkner had unlawfully expanded the scope of the traffic stop by asking investigatory questions that were unrelated to the purpose of the stop without independent constitutional justification. The state responded that Court of Appeals case law authorizes an officer to request consent to search a vehicle during an "unavoidable lull" in an investigation, such as when a person is searching for requested documents. The Court of Appeals agreed with the state and affirmed defendant's conviction in a per curiam decision. *See State v. Arreola-Botello*, 292 Or App 214, 418 P3d 785 (2018) (per curiam) (citing *State v. Hampton*, 247 Or App 147, 268 P3d 711 (2011), which held that questioning about consent to search a vehicle while the driver was searching for registration occurred during an "unavoidable lull" and, thus, did not extend the traffic stop in violation of Article I, section 9, protections against unreasonable seizure).

Defendant petitioned for, and we allowed, review. In this court, defendant renews his argument that Faulkner violated his Article I, section 9, rights when Faulkner asked him questions about drugs and weapons, and requested consent to search his vehicle, because those inquiries were unrelated to the purpose of the stop. Defendant proposes that officer questions or requests for consent to search that expand either the duration or the subject-matter scope of the traffic stop are not reasonably related to the purpose of the stop, and are thus impermissible under Article I, section 9, unless the officer has independent constitutional justification for making such inquiries. Accordingly, defendant argues that, in this case, Faulkner's questions exceeded the scope limitations inherent within Article I, section 9—that is, the questions were not reasonably related to the investigation of defendant's failure to signal—and also were not supported by any independent constitutional justification. According to defendant, when that questioning exceeded

the lawful scope of the stop, the stop became an unlawful seizure.

In response, the state contends that questions that are unrelated to the purpose of a stop do not implicate Article I, section 9, unless the questioning extends the duration of the stop. The state maintains that defendant's proposed rule is too rigid and prohibits an officer from making any unrelated inquiry without constitutional justification. The state argues that, as the Court of Appeals has held, additional questioning is permissible during an "unavoidable lull" in an investigation of the traffic violation, such as when the driver is searching for requested documents. Further, the state argues that, when an officer asks questions and requests consent to search a vehicle, it does not amount to a constitutional violation because neither action imposes any additional restraint on a motorist's liberty or freedom of movement beyond what is already in place by virtue of the traffic stop itself.

In addressing the party's arguments, we first reiterate that there are both statutory and constitutional limitations on an officer's authority to investigate unrelated crimes during a traffic stop. For example, ORS 810.410 governs an officer's ability to conduct an investigation during a traffic stop for a traffic violation, and, under that statute, officers are permitted to make additional, unrelated inquiries only in specific circumstances. *See* ORS 810.410(3)(c) (An officer "[m]ay make an inquiry into circumstances arising during the course of a detention and investigation *** that give rise to a reasonable suspicion of criminal activity."); ORS 810.410(3)(e) (When circumstances give rise to reasonable suspicion of criminal activity, an officer "[m]ay request consent to search in relation to [those] circumstances.").

Notwithstanding that statute, however, any evidence obtained when an officer exceeds that authority cannot be suppressed unless the exclusion of the evidence is required by the state or federal constitutions. *See* ORS 136.432(1) (so stating); *State v. Rodgers/Kirkeby*, 347 Or 610, 620-21, 227 P3d 695 (2010) (discussing ORS 136.432(1)). Since ORS 136.432 was enacted, defendants seeking to exclude evidence have, as defendant does here, asserted

constitutional arguments in support of their motions to suppress. *See State v. Watson*, 353 Or 768, 778, 305 P3d 94 (2013) (so stating). Thus, we turn now to the parties' constitutional arguments.

Article I, section 9, establishes "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." For purposes of Article I, section 9, a seizure occurs when (1) a police officer intentionally and significantly interferes with an individual's liberty or freedom of movement; or (2) a reasonable person, under the totality of the circumstances, would believe that his or her liberty or freedom of movement has been significantly restricted. *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010). In those circumstances, Article I, section 9, protects a person's liberty or freedom of movement by defining the authority of law enforcement officers in their encounters with citizens.

However, not all encounters between law enforcement officers and citizens implicate Article I, section 9. This court has previously identified three general types of police-citizen encounters and has categorized them according to the requirements for their initiation by law enforcement. *See, e.g.*, *Watson*, 353 Or at 774 (setting out three categories of police-citizen encounters); *State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991) (same). One type of encounter is a "mere conversation," or a "non-coercive encounter," and it does not involve any restraint on the liberty of an individual or his or her freedom of movement, and is not a seizure under Article I, section 9. *Rodgers/Kirkeby*, 347 Or at 621. On the other end of the spectrum, an arrest is recognized as a "seizure" under Article I, section 9, and requires probable cause. *Id.* This case involves a traffic stop, which falls somewhere in between: This court has recognized that, when a motorist is stopped for a traffic infraction, that stop implicates Article I, section 9, because:

> "[I]n contrast to a person on the street, who may unilaterally end an officer-citizen encounter at any time, the reality is that a motorist stopped for a traffic infraction is legally obligated to stop at an officer's direction *** and to interact with the officer, *** and therefore is not free

unilaterally to end the encounter and leave whenever he or she chooses."

*Id.* at 622-23.

This court has explained, in various circumstances, the limits that Article I, section 9, places on investigatory activities during a traffic stop. For example, in *Rodgers/Kirkeby*, we considered what constitutional limitations, if any, applied to an officer's ability to ask questions unrelated to the purpose of the traffic stop at the end of that stop, rather than issuing a citation or releasing the individual being questioned. In that case, the state argued that this court had already rejected the notion that an officer may never ask questions unrelated to the stop itself. *Id.* at 618. The state proposed that, as a rule, police questioning that is unrelated to a traffic stop, or a request for consent to search during a lawful traffic stop, does not constitute an unconstitutional seizure if that questioning creates only a *de minimis* delay during an otherwise lawful stop. *Id.* We disagreed, and we held that "police authority to detain that motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should have been completed." *Id.* at 623.

In reaching that conclusion, this court agreed with the state that an officer's verbal inquiries are not searches or seizures in and of themselves. *Id.* at 622. We determined, however, that the show of authority that is inherent in a traffic stop, combined with an officer's verbal inquiries, resulted in a restriction of a personal freedom that, absent reasonable suspicion, violated Article I, section 9. *Id.* at 627-28. Although we limited our analysis to the facts present in that case, we noted that "[p]olice conduct *during* a noncriminal traffic stop does not further implicate Article I, section 9, so long as the detention is limited and the police conduct is *reasonably related* to the investigation of the noncriminal traffic violation." *Id.* at 624 (emphases added).

In *Watson*, this court considered the authority of an officer to perform unrelated investigatory activities during a traffic stop. 353 Or at 769. In that case, the defendant

was stopped for failing to maintain a lane of traffic, and the officer requested his driver's license to verify his driving privileges and to run a warrants check. *Id.* at 769-70. While waiting for the results of the records check, the officer asked the defendant about community rumors that the defendant was dealing small amounts of marijuana and requested consent to search his vehicle. *Id.* at 770. The defendant denied the allegations and refused to consent to a search. *Id.* At that point, another officer arrived and reported a "strong odor" of what he believed to be marijuana emanating from the defendant's vehicle. *Id.* at 770-71. Ultimately, the officers searched the vehicle based on probable cause, located drugs, and arrested the defendant. The defendant moved to suppress the evidence, the trial court denied his motion, and he was convicted. *Id.* at 771-72.

On review, the defendant argued that an officer's authority to search should be strictly limited to the investigation of the initial traffic violation. 353 Or at 772. This court analyzed each individual police action—the initial stop, the records check, the warrants check, the questioning, and the ultimate search of the vehicle—to determine whether the officers' actions had exceeded the scope of their constitutional authority. *Id.* at 783-84. Considering each action individually, we concluded that each action had been reasonably related to the investigation of the traffic stop itself, had not led to the discovery of suppressible evidence, had not extended the stop, or had been justified by an independent constitutional justification (in that case, probable cause). *Id.* at 783-85. In reaching that conclusion, we held that, under Article I, section 9, investigatory activities must be reasonably related to the purpose of the traffic stop:

> "Thus, both Oregon statutes and this court's Article I, section 9, case law require that law enforcement officers have a justification for temporarily seizing or stopping a person to conduct an investigation, and that the officer's activities be reasonably related to that investigation and reasonably necessary to effectuate it. If the officer's activities exceed those limits, then there must be an independent constitutional justification for those activities."

*Id.* at 781.

The holding in *Watson* was subsequently applied in this court's next case that considered the limits on police authority during a traffic investigation, *State v. Jimenez*, 357 Or 417, 353 P3d 1227 (2015). In *Jimenez*, we considered whether Article I, section 9, permits a routine weapons inquiry during every traffic stop. *Id.* at 419. We concluded that a routine weapons inquiry, absent a showing of reasonable, circumstance-specific concerns for officer safety, fell outside the permissible scope of Article I, section 9. *Id.* In that case, the record did not support a finding that the officer had reasonable, circumstance-specific safety concerns because the officer had waited until he had completed his investigation of the traffic offense before inquiring about weapons. *Id.* at 430.

We again considered the permissible scope of Article I, section 9, in relation to a weapons inquiry, in *State v. Miller*, 363 Or 374, 376, 422 P3d 240 (2018). Although in *Miller* we ultimately concluded that the officer had a reasonable safety concern under the specific circumstances (and, thus, that the weapons inquiry had been justified), we specifically discussed the constitutional significance of additional verbal inquiries during the course of a traffic stop:

> "Although an officer's verbal inquiries 'are not searches and seizures and thus by themselves ordinarily do not implicate Article I, section 9,' when a person is already stopped, the person 'is not free unilaterally to end the encounter and leave whenever he or she chooses,' so questions that are not reasonably related to the purpose of the stop extend the stop in a way that requires some independent justification under Article I, section 9."

363 Or at 380 n 4 (quoting *Rodgers/Kirkeby*, 347 Or at 622-23).

The foregoing cases significantly inform the nature of the question before us. As the state recognizes, those cases stand for the proposition there are temporal limitations on an officer's authority in making a stop; therefore, inquiries that unreasonably extend the duration of a stop violate Article I, section 9. However, as we will explain, those cases also stand for the proposition that an officer's investigative *activities* during a stop must be reasonably related to the

purpose of the stop or have independent constitutional justification. Accordingly, the narrow question that those cases leave open is whether an officer's investigative *inquiries* during a traffic stop also must be reasonably related to the purpose of that stop. Before further discussing those cases and turning to that question, we briefly address the Court of Appeals' "unavoidable lull" doctrine.

The Court of Appeals first articulated its "unavoidable lull" doctrine in its own consideration of *State v. Rodgers*, 219 Or App 366, 182 P3d 209 (2008), *aff'd*, 347 Or 610, 227 P3d 695 (2010) (*Rodgers/Kirkeby*). As previously discussed, that case considered the constitutional question whether, at the end of a stop after the defendant was free to leave, an officer may extend the duration of the stop by asking additional questions that were unrelated to the purpose of the stop. The Court of Appeals concluded that "an officer is free to question a motorist about matters unrelated to the traffic infraction during an unavoidable lull in the investigation, such as while awaiting the results of a records check." *Id.* at 372. Stated another way, under the unavoidable-lull doctrine, so long as the officer does not delay the processing of a citation or extend the duration of the traffic stop, the officer is permitted to ask unrelated investigatory questions without constitutional justification. Ultimately, the Court of Appeals concluded that the doctrine did not apply in *Rodgers* because the officer had extended the duration of the stop when he began making additional inquiries. *Id.* at 373. When this court considered *Rodgers* on review, we affirmed the Court of Appeals' disposition, but we did not address the propriety of the unavoidable-lull doctrine because we also concluded that the officer had unlawfully extended the duration of the traffic stop. *Rodgers/Kirkeby*, 347 Or at 627.

In a later case, the Court of Appeals concluded that the unavoidable-lull doctrine did apply, holding that the officer's inquiries in that case did not implicate Article I, section 9, because the questioning had not unreasonably extended the duration of the traffic stop. *State v. Gomes*, 236 Or App 364, 372, 236 P3d 841 (2010). In *Gomes*, the Court of Appeals read our decision in *Rodgers/Kirkeby* as holding that the Oregon Constitution recognized only a temporal limitation

on an officer's ability to ask questions unrelated to the purpose of the stop. *Id.* at 371 ("We take that language to confirm our *Rodgers* opinion and our opinion in *State v. Amaya*, 176 Or App 35, 29 P3d 1177 (2001), *aff'd on other grounds*, 336 Or 616, 89 P3d 1163 (2004), that there are no Article I, section 9, implications if an inquiry unrelated to the traffic stop occurs during a routine stop but does not delay it.").

We agree with the Court of Appeals that, when an officer's questioning extends the reasonable duration of a traffic stop, Article I, section 9, requires independent constitutional justification. We disagree, however, with the suggestion in *Gomes* that *Rodgers/Kirkeby* confirmed that there is no subject-matter limitation on the permissible scope of police inquiries during a traffic stop under Article I, section 9. Rather, this court in *Rodgers/Kirkeby* expressly chose not to address that issue: "We express no opinion about the effect of unrelated police inquires that occur during the course of the traffic violation investigation and that do not result in any further restriction of movement of the individual." 347 Or at 627 n 5.

Here, the state argues that our decision in *Watson*, decided after *Rodgers/Kirkeby*, confirms that Article I, section 9, imposes only temporal limitations on when an officer who makes a lawful stop may ask unrelated investigatory questions. In support, the state focuses on two conclusions that we reached in *Watson*: First, that the records check in *Watson*, which had been conducted with the purpose of verifying the defendant's driving privileges, was constitutional, and, second, that the warrants check in *Watson*, which had been run simultaneously with the records check, did not render the defendant's detention unconstitutional. The state acknowledges that, in evaluating the constitutionality of the records check in *Watson*, this court expressly considered whether it had been reasonably related to the officer's investigation of the traffic infraction. That is, we considered whether the records check had been reasonably related to the officer's investigation of the traffic infraction before turning to the independent and separate question whether the records check unreasonably extended the duration of the stop. *See Watson*, 353 Or at 782 ("Because [the officer] conducted the records check with the purpose of verifying defendant's

driving privileges, [the officer]'s detention of defendant to conduct that check did not violate Article I, section 9, unless the detention was unreasonably lengthy."). The state contends, however, that the holding of *Watson* is captured in how this court addressed the warrants check: declining to address whether the warrants check had been reasonably related to the traffic stop because, in part, that check did not extend the length of the stop. The state argues that, when this court did not address whether the warrants check had been reasonably related to the traffic stop, we necessarily concluded that unrelated investigatory activities do not implicate Article I, section 9, if they are conducted during activities related to the stop and do not extend the stop.

We disagree. Contrary to the state's argument, in *Watson*, this court determined that it had no need to resolve the question whether the warrants check had been reasonably related to the stop because that check had not produced suppressible evidence *and* had not extended the stop. *Watson*, 353 Or at 784. If, in *Watson*, the warrants check—which had been run simultaneously with the records check and therefore did not extend the duration of the stop—had led to evidence that the defendant sought to suppress, we would have been required to decide whether the warrants check had been reasonably related to the stop. And, if the warrants check had extended the stop, that alone would have required a determination that the check exceeded the permissible scope of the stop. But, as noted, we determined that the warrants check had not produced suppressible evidence *and* had not extended the stop. We therefore declined to reach the question whether the warrants check was reasonably related to the stop.[3] As we stated in *Watson*: When conducting an investigation during a lawful stop, "*activities*" of law enforcement must "be reasonably related to that investigation and reasonably necessary to effectuate it." *Id.* at 781 (emphasis added).

We did, however, leave open in *Watson* the issue that this case presents—whether the principle that we

_____

[3] Here, Faulkner did not perform a warrants check. Therefore, the question whether a warrants check is, or can be, reasonably related to the purpose of a traffic stop, is not before us.

announced in *Watson* "extends to *inquiries* during the course of a stop." *Id.* at 779 n 13 (emphasis added). In other words, *Watson* held that Article I, section 9, imposes both subject-matter and durational limits on an officer's ability to conduct unrelated investigative *activities* during a traffic stop; the question expressly left open was whether an officer's investigative *inquiries* also are subject to subject-matter as well as durational limitations.[4] The facts here require us to address that question, and it is to that question that we now turn.

As stated, Article I, section 9, governs a broad spectrum of law enforcement conduct, and, as this court has recognized, the degree to which law enforcement conduct intrudes on an individual's interest in personal security varies depending on the circumstances. *See State v. Fair*, 353 Or 588, 600, 302 P3d 417 (2013) ("The degree to which law enforcement conduct intrudes on a citizen's protected interest in privacy and liberty is significantly affected by where the conduct occurs, such as in the home, in an automobile, or on a public street."). Not every intrusion on an individual's interest in personal security is unconstitutional; Article I, section 9, prohibits only "arbitrary, oppressive, or otherwise 'unreasonable'" intrusions on those interests. *State v. Barnthouse*, 360 Or 403, 413, 380 P3d 952 (2016). Thus, some law enforcement conduct constitutes such minimal intrusion on an individual's interests that the conduct is not unreasonable under Article I, section 9. *See Holmes*, 311 Or at 407 (a police-citizen encounter involving "mere conversation, a non-coercive encounter" does not require

---

[4] The dissent views our cases differently, understanding them to hold only that police activity that is reasonably related to the purpose of a traffic stop and reasonably necessary to effectuate it "does not result in an extension of the stop beyond the time reasonably necessary to conclude it." 365 Or at 718 (Garrett, J., dissenting). That view of our cases is incorrect. First, that is not what we said in those cases. Second, in *Watson*, we independently considered two different questions when determining whether the officer's activities exceeded the scope of the stop—first considering the subject matter of the records check and then considering its duration. *See Watson*, 353 Or at 782-83. We did so because even an investigative activity that is reasonably related to the purpose of a stop may violate Article I, section 9, if it is unreasonably lengthy. Third, in *Watson*, the warrants check did not extend the stop beyond the time necessary to conduct the records check. We did not uphold the warrants check on that basis; we upheld it on the basis that the check had not produced suppressible evidence. *Id.* at 784.

constitutional justification). On the other hand, some law enforcement activity rises to the level of a search or a seizure, which constitutes a more substantial intrusion on an individual's personal security interest.

Generally, an officer cannot seize an individual without probable cause to believe that that individual has engaged or is engaging in criminal activity, and obtaining a warrant permitting the seizure. There are exceptions, however, to both the warrant requirement and the probable cause requirement for seizures that are limited in scope and duration. *See State v. Cloman*, 254 Or 1, 6, 456 P2d 67 (1969) (police can stop a car to determine identity of vehicle and its occupants based on reasonable suspicion, and reasonable suspicion is "of less quantum" than probable cause to arrest). In *Cloman*, this court stated that "there is nothing *ipso facto* unconstitutional in the brief detention of citizens under circumstances not justifying an arrest, for purposes of limited inquiry in the course of routine police investigations." 254 Or at 7. The Oregon Legislative Assembly codified that decision in statutes regulating the authority of law enforcement to stop individuals. *See* ORS 131.605 to 131.625. Relevant to this case, as part of the enactment intended to codify *Cloman*, the legislature specified in ORS 131.615 that an officer "who reasonably suspects that a person has committed or is about to commit a crime may stop the person and *** make a reasonable inquiry." *See also State v. Valdez*, 277 Or 621, 624, 561 P2d 1006 (1977) (discussing statute). Additionally, ORS 131.615(2) specifies that such a stop shall last no longer than a reasonable time, and ORS 131.615(3)(a) further provides that "[t]he inquiry shall be considered reasonable only if limited to *** [t]he immediate circumstances that aroused the officer's suspicion." Brief stops to investigate whether an individual has committed a traffic infraction are of that nature. *See* ORS 810.410 (2)(a)-(b) (so stating).[5] Article I, section 9, permits brief traffic stops to investigate unlawful, noncriminal activity when the stops are of limited scope. *See Rodgers/Kirkeby*, 347 Or

---

[5] Whether the statutory requirement that an officer have probable cause to believe that a person has committed a traffic offense to justify a traffic stop is also a requirement under Article I, section 9, is a question that this court has reserved. *State v. Matthews*, 320 Or 398, 402 n 2, 884 P2d 1224 (1994).

at 623 ("Police authority to perform a traffic stop arises out of the facts that created probable cause to believe that there has been unlawful, noncriminal activity, *viz.*, a traffic infraction.").

Whether an officer is investigating criminal or unlawful noncriminal activity, the officer's authority to stop an individual—based on reasonable suspicion of criminal activity or on probable cause of unlawful noncriminal activity—is founded on the assumption that temporary, investigative stops to investigate particular conduct are permitted for that particular purpose only.[6] It therefore follows that limits apply to an officer's ability, during such a stop, to use that stop for other purposes. As we explained in *Watson*, it is "the justification for the stop" that "delineates the lawful bounds of the traffic stop." 353 Or at 778-79.

Here, the state argues that we should conclude that defendant's Article I, section 9, rights were not violated because Faulkner's request for consent to search defendant's vehicle did not impose any restraint beyond the stop itself. To support that argument, the state makes two points. First, the state contends that the right to be free from unlawful seizure is a right that protects only the freedom of movement. Article I, section 9, protects at least the right to move freely, and we agree that our test to determine when a seizure has occurred is based on the degree to which an officer has interfered with an individual's freedom of movement. For example, in *Rodgers/Kirkeby*, we stated that a person is seized when an officer "intentionally and significantly interferes with the person's freedom of movement." 347 Or at 621. However, the question here is not whether defendant was seized—he was. The question, rather, is whether the officer who seized defendant was limited by Article I, section 9, in the inquiries he could make during that seizure.

Second, the state contends that, because an officer's request for consent to search during a consensual police-citizen encounter does not restrict a defendant's liberty and constitute a search or seizure, a request for consent to

---

[6] When an officer stops an individual based on probable cause of a traffic violation, an officer may issue a citation for that traffic violation but may not arrest an individual for the violation. ORS 810.410(2)-(3)(a).

search *during* a seizure has no significance under Article I, section 9. We agree that a request for consent to search is not, by itself, a search or a seizure. *See State v. Highley*, 354 Or 459, 461, 313 P3d 1068 (2013) (so stating). However, we disagree that, when a request for consent to search is made during a lawful seizure, that request is not of constitutional significance. In *Watson*, the question whether the warrants check was reasonably related to the traffic investigation was of constitutional significance even though that check itself did not impose an independent restraint on the defendant's liberty. 353 Or at 788-84. And we explained the reason for the significance of an officer's verbal inquiries in *Miller*:

> "Although an officer's verbal inquiries 'are not searches and seizures and thus by themselves ordinarily do not implicate Article I, section 9,' when a person is already stopped, the person 'is not free unilaterally to end the encounter and leave whenever he or she chooses,' so questions that are not reasonably related to the purpose of the stop extend the stop in a way that requires some independent justification under Article I, section 9."

363 Or at 380 n 4 (quoting *Rodgers/Kirkeby*, 347 Or at 622-23).

As our cases demonstrate, Article I, section 9, limits not only when a stop may be made, but also the purpose for which it is conducted. A stop that is reasonable for a limited investigatory purpose is not necessarily reasonable for all purposes, and we see no reason to distinguish between the activities that law enforcement officers conduct during such a stop and the questions that they ask; both must be reasonably related to the purpose that permits the officer to stop an individual in the first place. If we were to hold otherwise, then an officer who lacks a warrant, probable cause, or even reasonable suspicion of criminal activity, could stop an individual for a minor traffic offense, and, during that stop, conduct a criminal investigation anyway, making meaningless the rule which requires an officer to have reasonable suspicion before stopping an individual to conduct a criminal investigation. Thus, when determining whether a stop that was reasonable at the outset has become unreasonable, we must consider the totality of its circumstances, not only its duration.

In sum, we conclude that, for the purposes of Article I, section 9, all investigative activities, including investigative inquiries, conducted during a traffic stop are part of an ongoing seizure and are subject to both subject-matter and durational limitations.[7] Accordingly, an officer is limited to investigatory inquiries that are reasonably related to the purpose of the traffic stop or that have an independent constitutional justification. Put simply, an "unavoidable lull" does not create an opportunity for an officer to ask unrelated questions, unless the officer can justify the inquiry on other grounds.

We realize that our decision precludes officers from asking certain investigative questions during investigatory stops—those unrelated to the purpose of the investigation and without independent constitutional justification. But that is as the constitution requires and, for statutory purposes, what the legislature intends.[8] *See* ORS 131.615(3)(a) (officer's inquiries during traffic stop reasonable only if limited to the "immediate circumstances that arouse the officer's suspicion"). Given the near necessity of driving today, it is certainly not uncommon for a citizen to be lawfully stopped for a minor traffic violation. *See* Wayne R. LaFave, *The "Routine Traffic Stop" From Start to Finish: Too Much*

---

[7] The dissent criticizes us for failing to expressly justify a rule that police activities and inquiries during a traffic stop must be reasonably related to the purpose of the stop and reasonably necessary to effectuate it. 365 Or at 719 (Garrett, J., dissenting). The dissent may not accept the reasons for those rules, but we have stated them both in *Watson* and here: Police have authority to interfere with an individual's liberty interest and to stop that individual on reasonable suspicion and without probable cause of criminal activity for only a limited purpose—to investigate the matter that gives rise to the reasonable suspicion. It is the justification for the stop that delineates its lawful bounds. Article I, section 9, does not permit a stop that is authorized for a *limited* purpose to be used for *all* purposes. If it did, then in many cases there would be no need for an officer to develop the reasonable suspicion necessary to stop an individual to conduct a criminal investigation, and that protection would be meaningless.

[8] The dissent is concerned about what an officer can do during a ten-minute wait other than conduct activities and make inquiries reasonably related to the purpose of the stop and reasonably necessary to effectuate it. 365 Or at 720 (Garrett, J., dissenting). We do not share that concern. If an officer develops reasonable suspicion that the stopped individual has engaged in illegal activity in addition to that for which the individual was stopped, then the officer may investigate that activity. Without such suspicion, an officer should limit investigative activities and inquires to matters that are, as statute requires, limited to the "immediate circumstances that arouse the officer's suspicion" or that will not result in the discovery of suppressible evidence. ORS 131.615(3)(a).

*"Routine," Not Enough Fourth Amendment*, 102 Mich L Rev 1843, 1852-53 (2004) (describing the ease of unintentionally committing a minor traffic violation while driving); David A. Harris, Essay, *Car Wars: The Fourth Amendment's Death on the Highway*, 66 Geo Wash L Rev 556, 567-68 (1998) (describing how an officer can easily develop constitutional justification to stop a driver by simply following a vehicle for a short period of time until they observe a traffic infraction). If, after stopping an individual based on probable cause that the individual committed a traffic offense, an officer may inquire into criminal activity without reasonable suspicion of a specific crime, an officer will have less of an incentive to develop the requisite reasonable suspicion of that crime which ordinarily would be required to stop the individual for a temporary criminal investigation. By applying subject-matter limitations to investigative activities and questioning, Article I, section 9, ensures that officers do not turn minor traffic violations into criminal investigations without a constitutional basis for doing so.[9]

With that understanding of Article I, section 9, we conclude, in this case, that Faulkner's questioning and request to search defendant's vehicle violated Article I, section 9. Although Faulkner had probable cause to believe that defendant had committed a traffic infraction when he failed to signal a turn and, therefore, was permitted to stop defendant to investigate that infraction, Faulkner then asked questions that were not reasonably related to that investigation and exceeded its lawful scope. Faulkner stopped defendant for failing to use a turn signal, but then inquired about the possession of guns or controlled substances. The

_____

[9] A subject-matter limitation requires that all additional questioning be based on constitutionally sufficient grounds and not on implicit or explicit biases. The *amicus* brief submitted by the Oregon Criminal Defense Lawyers Association and the Oregon Justice Resource Center presents significant statistical data to illustrate the disparate treatment of black and Hispanic motorists during the course of traffic stops, showing specifically that nationwide, and in Oregon, people of color are statistically more likely to be searched during traffic stops than their white counterparts. *See* Frank R. Baumgartner *et al*, *Racial Disparities in Traffic Stop Outcomes*, Duke Forum for Law and Social Change Vol 9:21 at 33 (2017). Furthermore, there may be additional biases that motivate an officer to ask unrelated investigatory questions without independent constitutional justification. Our conclusion today—that all questioning must be reasonably related to the purpose for the traffic stop—will ensure that an officer's questions are not based on such biases.

record does not demonstrate that the latter questioning was reasonably related to the investigation of the former investigation. The investigation of defendant's failure to signal a turn may have warranted questions about whether or why defendant acted or failed to take that action, other questions or actions reasonably related to that inquiry, or other questions or actions reasonably necessary to the issuance of a warning or a citation, such as questions to address reasonable officer-safety concerns. But, here, the state does not claim any such connections or concerns, and the record does not support the notion that any exist.

In addition, if there were evidence that, during the stop, Faulkner had learned facts giving rise to reasonable suspicion that defendant had engaged or was about to engage in criminal conduct, an expanded investigation could have been justified. But here, Faulkner did not testify to any particularized suspicion that defendant had weapons, controlled substances, or any other contraband in his vehicle. To the contrary, Faulkner testified that he asks such questions every time he makes a stop. Accordingly, Faulkner's questioning and request to search the vehicle were impermissible and a violation of Article I, section 9, protections against unreasonable seizure.

Having concluded that defendant was unlawfully seized in violation of Article I, section 9, we must now determine the effect of that constitutional violation on the admissibility of the evidence obtained during the consensual search of defendant's vehicle. Generally, evidence will be suppressed if the evidence was the product of an unconstitutional act. *State v. Juarez-Godinez*, 326 Or 1, 9, 942 P2d 772 (1997) (so stating). Here, defendant's voluntary consent to search the vehicle was granted in response to Faulkner's unlawful line of questioning and request for consent. In some cases, "a defendant's voluntary consent itself may be sufficient to demonstrate that the unlawful conduct did not affect or had only a tenuous connection to the evidence produced." *State v. Unger*, 356 Or 59, 77-78, 333 P3d 1009 (2014). It is the state's burden to prove that the consent was "independent of, or only tenuously related to, the illegal police conduct." *Id.* at 84. Here, the state reasonably does not argue in this

court, and did not argue in the Court of Appeals, that defendant's consent was only tenuously related to Faulkner's illegal inquiries. Accordingly, the trial court erred in denying defendant's motion to supress the evidence.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings consistent with this opinion.

**GARRETT, J.,** dissenting.

This court has held that, in ordinary police-citizen encounters (that is, encounters that are not seizures), police may engage citizens in "mere conversation" and generally ask questions of them without implicating Article I, section 9. *State v. Warner*, 284 Or 147, 161, 585 P2d 681 (1978); *see also State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991) (comparing ordinary "noncoercive" encounters with stops and arrests, which are both seizures requiring constitutional justification). We have also held that, because a traffic stop is a seizure, police may continue the traffic stop for only so long as the basis for that seizure exists; thus, police may not extend the stop with questioning, "mere conversation," or other activities unrelated to the original basis for the stop, unless they have an independent and constitutionally sufficient basis to continue the detention for such activities. *See State v. Rodgers/Kirkeby*, 347 Or 610, 623-24, 227 P3d 695 (2010) (so stating).

The question left unanswered until today is what subject matter restrictions, if any, apply to police activity that is not related to the original basis for the traffic stop but that also does *not* cause any prolongation of the stop. The Court of Appeals has addressed the issue and concluded that, so long as unrelated activity occurs during an "unavoidable lull" in the traffic stop, then such activity effects no greater restriction on liberty than was already in place. *See State v. Gomes*, 236 Or App 364, 370-71, 236 P3d 841 (2010). Therefore, it is of no constitutional import. *See id.* ("there are no Article I, section 9, implications if an inquiry unrelated to the traffic stop occurs during a routine stop but does not delay it").

That "unavoidable lull" rule is consistent with the decisions of this court that have defined a "seizure" for purposes of Article I, section 9, to occur "when either (1) a police officer intentionally and significantly interferes with the person's freedom of movement; or (2) the person believes, in an objectively reasonable manner, that his or her liberty of movement has been so restricted." *Rodgers/Kirkeby*, 347 Or at 621 (internal quotation marks omitted). Simply put, when an officer's question unnecessarily extends a traffic stop, that question represents an additional interference with that liberty interest and may therefore require an additional justification. But if a person has already been seized as a result of a lawful traffic stop, and the length of the stop is *not* extended, then questioning on unrelated matters does not cause any additional interference with the person's freedom of movement.

Today, the majority rejects the "unavoidable lull" rule, concluding that, unless they have independent constitutional justification, police are prohibited from engaging in activity or inquiring into any matters unrelated to the original basis of the stop, even if such activity does not extend the stop. Thus, if an officer observes behavior during a traffic stop that causes the officer to be concerned about past, present, or future criminal activity, but the officer does not yet possess enough information that would support an objectively reasonable suspicion or pose officer-safety concerns, then the officer may not ask questions or take other steps to investigate. That limitation does not govern police-citizen interactions in other contexts. Indeed, it will only partly govern police-citizen interactions in *this* context—the surprising result of the majority's decision is that, during a lull, an officer may make inquiries of the passenger of a stopped car but be absolutely forbidden from asking the same questions of the driver. *See State v. Stevens*, 364 Or 91, 93, 97-100, 430 P3d 1059 (2018) (explaining that certain inquiries do not restrain a passenger's liberty or freedom of movement in a significant way and, thus, do not implicate Article I, section 9).

There may be sound reasons for such a rule. I dissent from today's decision because those reasons have not

been adequately explained, and, as a result, today's decision raises significant questions without providing an analytical framework that will help lower courts answer them.

The majority bypasses crucial steps in the analysis by interpreting this court's precedents to have already decided the key question. According to the majority, we have already held that "an officer's investigative *activities*" during a traffic stop must be "reasonably related to the purpose of the stop or have independent constitutional justification," and today's decision simply addresses the "narrow question" of whether an officer's "inquiries" are treated any differently. 365 Or at 704-05 (emphasis in original). That is not an accurate statement of our case law. Our past statements considering whether an officer's activities were reasonably related to the purpose of a traffic stop arose in the context of considering whether the officer had unlawfully *extended* the stop. The statements on which the majority relies can be correctly understood only in that context.

In the seminal case, *Rodgers/Kirkeby*, we first held that officers may not extend the duration of traffic stops to inquire into unrelated matters without independent constitutional justification. 347 Or at 626-28.

In *State v. Watson*, 353 Or 768, 769, 305 P3d 94 (2013), an officer stopped the defendant for a traffic violation. Although he decided not to issue a citation, the officer continued to detain the defendant while running records and warrants checks. 353 Or at 770. While awaiting the results of those checks, which took the same amount of time, officers developed suspicion that the vehicle contained marijuana, searched it, and found drugs. *Id.* at 770-71. On review, the defendant argued that the records and warrants checks had been unnecessary and thus extended the stop under *Rodgers/Kirkeby*, requiring suppression of the evidence discovered during that period. *Id.* at 781-82. We held that the records check had been done to verify the defendant's driving privileges and thus had been related to the purpose of the stop. *Id.* at 782. We then explained that it was unnecessary to further consider the warrants check because there was "no indication that the warrants check

produced incriminating evidence or extended the duration of the stop." *Id*. at 784.[1]

Following *Watson*, in *State v. Jimenez*, 357 Or 417, 430-31, 353 P3d 1227 (2015), we held that the officer's routine weapons inquiry at the conclusion of his jaywalking investigation was unlawful because it was not supported by any reasonable, circumstance-specific concerns for officer safety. Our holding did not, as the majority implies, rest on the fact that the weapons inquiry exceeded what we took to be the "permissible scope" of questioning based on the purpose of the stop. *See* 365 Or at 704. Rather, in that case, once again, the questioning about weapons had caused a temporal extension of the stop. *Jimenez*, 357 Or at 420, 424 n 7. Thus, the weapons inquiry—because it had not been reasonably related to the purpose of the stop or supported by an independent constitutional basis—caused the *extension* of the stop that *resulted from that inquiry* to be unlawful. *Id*. at 433 (Kistler, J., concurring) (so noting).

What those cases tell us is that police activity that is reasonably related to the purpose of a traffic stop and reasonably necessary to effectuate that purpose is *part of effectuating that purpose* and therefore, by definition, does not result in an extension of the stop beyond the time reasonably necessary to conclude it. In contrast, if police activity is not reasonably related to the purpose of the stop, then it *may* result in an unlawful extension of the stop. I emphasize "may," because the key fact that today's majority overlooks is that those cases involved arguments that the stop had been temporally extended by the challenged activity. Thus, the

---

[1] The majority focuses on *Watson*'s observation that the *warrants* check was irrelevant because it did not produce incriminating evidence "or" extend the stop. I understand the majority to infer from the disjunctive phrasing that the *Watson* court meant that, if the warrants check *had* led to incriminating evidence, then the court would have proceeded to determine whether the warrants check was reasonably related to the purpose of the stop, regardless of whether or not the warrants check caused any additional extension of the stop. From that inference, the majority appears to then conclude that *Watson* supports the idea that all police "activity" must be "reasonably related" to the purpose of the stop. But the inference is debatable; the court in *Watson* never explained what would have happened on a different set of facts, and it certainly never explained that it was adopting the rule that the majority attributes to it. In fact, *Watson* largely synthesized and applied existing cases and did not purport to announce any new rule.

proposition for which our prior cases stand is that unrelated police questioning, *if it results in an extension of the stop*, is unlawful unless supported by constitutional justification.

Thus, when the majority asserts that we have already "held"[2] that "an officer's investigative *activities* during a stop must be reasonably related to the purpose of the stop or have independent constitutional justification," 365 Or at 704-05 (emphasis in original), it overstates what those cases actually decided. And, because the majority views that rule as already having been announced, the majority does not justify it.

The majority insists that justification is found in our past observation that the "justification for the stop" is what "delineates the lawful bounds of the traffic stop." 365 Or at 710 (quoting *Watson*, 353 Or at 778-79). But, again, that observation is rooted in the facts of our temporal extension cases; as such, it means that an officer who has temporarily interfered with the driver's *freedom of movement* for a specific purpose may not effect a *new and additional* interference with that liberty interest by asking about unrelated matters. That principle tracks our statement in *Rodgers/Kirkeby* regarding what, in this context, constitutes a seizure in the first place: "when either (1) a police officer intentionally and significantly interferes with the person's freedom of movement; or (2) the person believes, in an objectively reasonable manner, that his or her liberty of movement has been so restricted." 347 Or at 621 (internal quotation marks omitted). Thus, viewed in context, saying that the justification for the stop "delineates the lawful bounds" of the stop is just another way of saying that the driver's freedom of

---

[2] The key language in *Watson* on which the majority relies is this: "Thus, both Oregon statutes and this court's Article I, section 9, case law, require that law enforcement officers have a justification for temporarily seizing or stopping a person to conduct an investigation, and that the officer's activities be reasonably related to that investigation and reasonably necessary to effectuate it." 353 Or at 781. That language does appear to support the majority's decision, but only because the majority mistakenly views that as the "holding" of *Watson*. *See* 365 Or App 704. It was not; the quoted language immediately followed the court's description of *Rodgers/Kirkeby* and other cases and was clearly meant to synthesize the rule established by *those* cases. *See Watson*, 353 Or at 778-81. And, because those cases involved arguments that stops had been *extended*, *Watson*'s summary of the rule necessarily incorporated that factual limitation.

movement may be restricted only for so long as the justification for the stop exists. What the majority fails to explain is how, if Article I, section 9, is concerned with a person's "freedom of movement," it can be offended by an officer's question or action that causes no further restriction on movement. Rather, the majority's conclusion seems to rest on a reconceptualization of the Article I, section 9, liberty interest that is never made explicit.

That is problematic. Because we have never held that all investigative activity during a traffic stop must have constitutional justification regardless of whether it extends the stop, we have never addressed what that actually means, which will pose difficulties for police trying to understand this rule and for trial courts trying to apply it. What constitutes investigative activity? We know from today's decision that a request for consent to search goes too far. But does the majority's rule encompass less invasive interaction, or activity that involves no interaction with the driver at all, such as a warrants check? If an officer develops an intuition, on the basis of training and experience, that something is not right, but lacks enough information to have a reasonable suspicion of criminal activity, may the officer engage the driver in "mere conversation" in the hope of eliciting additional useful information? If not, what *can* an officer do during a ten-minute wait? And if so, may that conversation include questions—or are questions off limits because they are "inquiries"? May the officer use the unavoidable lull to contact colleagues to see if they know anything about the driver, or take other steps to gather information from outside sources?

It is not clear how those questions are to be answered. It is clear, however, that the majority's new rule means that, during an unavoidable lull in a traffic investigation, police officers must avoid engaging in at least some of the ordinary police work that they routinely perform in other settings. As I noted above, there may be good reasons for such a rule. I am not persuaded, however, by the majority's view that Article I, section 9, compels it. Therefore, I respectfully dissent.

Balmer, J., joins this dissenting opinion.