Argued and submitted May 8, 2019, reversed and remanded December 9, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MELISSA ANN HALLAM,
*Defendant-Appellant.*

Douglas County Circuit Court
15VI165487, 15CR55491;
A166144 (Control), A166151

479 P3d 545

Defendant appeals a judgment of conviction for unlawful possession of methamphetamine, ORS 475.894, assigning error to the trial court's denial of her motion to suppress evidence obtained during a traffic stop. This case was litigated, both at trial and on appeal, prior to *State v. Arreola-Botello*, 365 Or 695, 451 P3d 939 (2019), in which the Oregon Supreme Court refocused the inquiry away from the unlawful extension of a traffic stop, to the proper scope of a traffic stop, announcing, in essence, a subject matter limitation on the questions that an officer can ask during such an encounter. Defendant's arguments on appeal mirror the prevailing arguments in *Arreola-Botello*. The state concedes that a subject matter limitation such as that ultimately announced in *Arreola-Botello* would be dispositive on the merits of the case, but contends that defendant's arguments are unpreserved. *Held*: Defendant failed to preserve a subject matter limitation argument before the trial court. However, in light of the change in the law brought about by *Arreola-Botello*, and in light of the state's concession, the issue qualified as one of "plain error" worthy of the exercise of discretion to correct.

Reversed and remanded.

Frances Elaine Burge, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services, argued the cause and filed the brief for appellant.

David B. Thompson, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and James, Judge, and Landau, Senior Judge.

JAMES, J.

Reversed and remanded.

**JAMES, J.**

Defendant appeals a judgment of conviction for unlawful possession of methamphetamine, ORS 475.894, assigning error to the trial court's denial of her motion to suppress evidence obtained during a traffic stop. This case was litigated, both at trial and on appeal, before the Oregon Supreme Court decided/issued its opinion in *State v. Arreola-Botello*, 365 Or 695, 451 P3d 939 (2019). In *Arreola-Botello*, the court refocused the inquiry away from the unlawful extension of a traffic stop, *see State v. Rodgers/Kirkeby*, 347 Or 610, 227 P3d 695 (2010), to the proper scope of a traffic stop, announcing, in essence, a subject matter limitation on the questions that an officer can ask during such an encounter.

Defendant's arguments on appeal in this case mirror the arguments that ultimately prevailed in *Arreola-Botello*. At oral argument here, the state acknowledged that a subject matter limitation, as ultimately announced in *Arreola-Botello,* would be dispositive on the merits of this case, noting that under any such rule of law, the state's case here would be "in trouble." However, the state argues that the subject matter limitation argument defendant raises on appeal was not preserved before the trial court, and that for reasons of preservation, we should affirm. Defendant, for her part, claims that the subject matter limitation argument was preserved.

As we explain, we agree with the state that defendant failed to preserve a subject matter limitation argument before the trial court. However, in light of the change in the law brought about by *Arreola-Botello*, and in light of the state's acknowledgment that the facts of this case would not withstand *Arreola-Botello*'s subject matter limitation—a concession that is well-taken—the issue qualifies as one of "plain error." ORAP 5.45(1); *State v. Jury*, 185 Or App 132, 136, 57 P3d 970 (2002), *rev den*, 335 Or 504 (2003) ("Error, in general, must be determined by the law existing at the time the appeal is decided, and not as of the time of trial." (Footnote omitted.)). We exercise our discretion under *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382, 823 P2d 956 (1991) to correct the error and, accordingly, reverse and remand.

        The pertinent facts are undisputed. Douglas County Sheriff Deputies Gardner and Reavis stopped defendant after she committed a traffic infraction. Defendant could not produce proof of registration or insurance and searched for the documents for several minutes, including opening the trunk of her car at one point. As she searched in the trunk, deputies saw a box of .22 caliber ammunition, though they saw no weapon. Gardner returned to the patrol car to write citations, while Reavis remained at the car with defendant.

        Gardner contacted dispatch to run defendant's license and to complete a computerized criminal history (CCH) report. Both Gardner and Reavis testified that running a check for warrants and driving records takes less than three minutes, while running a CCH check takes several minutes longer. Gardner did not know whether defendant had a criminal record, but he knew that she "associate[d] with numerous drug users and drug dealers." Based on these associations, Gardner assumed defendant might have a recent felony conviction. And based on the ammunition observed in the trunk of the car, he assumed she might have a firearm (and further assumed that would be illegal if she had a recent felony conviction). While waiting for a response from dispatch about defendant's criminal record, Gardner wrote her citations for driving uninsured, failure to register a vehicle, and failure to stop when emerging. He spent about 10 minutes in the patrol car.

        In the meantime, Reavis's conversation with defendant quickly escalated from small talk to questions about her drug use, whether she had any contraband in her car, and when she was last convicted of a felony. He asked defendant whether she had been able to "stay clean." As Reavis testified:

    "*** I asked her about her drug use and asked her if she had been able to stay clean for a while and she told me that she had. I asked her when the last time she used was and she couldn't tell me specifically but she said it had been a long time ago. I told her that's not what I had been hearing while speaking to people in the area there. I asked her when her last felony conviction was and she told me it was over 15 years ago. I asked her what it was for. She said it was for meth. I then asked her if there was anything illegal

in the vehicle or if she had anything illegal in the vehicle and she told me she did not."

Reavis told defendant that he had heard she was using meth from "people *** in the community." Reavis then asked defendant to "prove" that she was not using drugs. As Reavis testified:

"*** I told her that I would like to give her the opportunity to prove me, or prove it to me that, that, that she was being clean and she was truthfully not using methamphetamine and that she didn't have any[thing] illegal with her. And then I asked her if she would give me consent to search the vehicle."

Defendant gave her consent and stepped out of the car, holding her purse tightly to her body. This raised Reavis's suspicions, and he asked her if he could search her purse. Defendant opened her purse, revealing a purple bag which she told Reavis contained "personal stuff." At this point Gardner leaned out of his patrol car to tell Reavis that defendant had had a felony conviction within the previous 15 years.

Reavis began to feel nervous about defendant holding the purse and asked her if he could put it on the roof of her car. She reluctantly gave it to him. Then, Reavis questioned defendant about the contents of her purse:

"I asked her if I searched her purse if there would be anything illegal inside of it and she just looked at me. She didn't say anything. And it was just kind of that awkward silence for a little bit. And then I asked her if she would please be honest with me and she told me I have meth in it."

Reavis then searched the purse and found 0.6 grams of meth and a snort tube inside a purple bag. Reavis and Gardner finished writing defendant's vehicle code citations and added another for possession of methamphetamine (ORS 475.894).

Defendant moved to suppress the evidence of meth and paraphernalia before trial. She filed a bare bones "points and authorities" motion—one in which she listed a series of constitutional provisions and cases, but offered no actual argument as to how those authorities applied to the

case, or what was her legal theory as to why suppression was constitutionally required. At argument on the motion, she focused on the unlawful extension of the traffic stop, an argument tracking the analysis of *Rodgers/Kirkeby*, 347 Or at 610.

The trial court determined that the stop was not unlawfully extended by Gardner requesting defendant's computerized criminal history or any of the deputies' other actions:

> "[B]ased on the testimony that I, that I was provided by Deputy Reavis, Reavis and Deputy Gardner, I don't find that there was any contrary evidence indicating that that was an unreasonable amount of time. Although the, Deputy Gardner could not say exactly each minute what he was doing, he very clearly indicated that he was waiting for the criminal history check by dispatch. There was time, the time that that took. He was also starting to fill out the citation while he was also watching Deputy Reavis' contact with [defendant] to make sure that he was watching for officer safety."

In the stipulated facts trial that followed, the court found defendant guilty of unlawful possession of methamphetamine and two vehicle code violations, and this appeal followed.

On appeal, defendant assigns error to the trial court's denial of her motion to suppress, arguing first, under *Rodgers/Kirkeby*, that the deputies' inquiries unlawfully extended the traffic stop. But, in the alternative, she argues that the deputies' investigation was impermissible in *scope*. As defendant argues on appeal, Reavis "significantly interfered with defendant's liberty by forcing her to interact with him on a subject for which Reavis had no basis to question [her]."

With that background, we turn to the issue on appeal, beginning with preservation. Defendant argues that her written motion, in particular the portion of the motion which stated "[t]he intensity and duration of the stop exceeded the legal basis giving rise to the stop" preserved the *Arreola-Botello* argument she now advances on appeal. We disagree.

It is unclear what, *if anything*, defendant's written motion preserved. "A written motion to suppress 'serves dual functions[:] It frames the issues that the court will be required to decide, and it notifies the state of the contentions that it must be prepared to address at the hearing on the motion.'" *State v. Parnell*, 278 Or App 260, 265, 373 P3d 1252 (2016) (quoting *State v. Sweet*, 122 Or App 525, 529, 858 P2d 477 (1993) (brackets in *Parnell*; internal citation omitted)); *see also State v. Anderson-Brown*, 277 Or App 214, 220, 369 P3d 1248, *rev den*, 360 Or 465 (2016).

A "points and authorities" style motion, like the one filed here, may, in some circumstances, be minimally adequate to meet the requirements of Uniform Trial Court Rule (UTCR) 4.060(1), which provides:

"All motions to suppress evidence:

"(a)   must cite any constitutional provision, statute, rule, case, or other authority upon which it is based; and

"(b)   must include in the motion document the moving party's brief, which must sufficiently apprise the court and the adverse party of the arguments relied upon."

In the case of a warrantless seizure or search we have noted:

"The rule contains no requirement that a suppression motion contain detailed factual arguments. Instead, a motion that generally identifies a search or seizure by the state, asserts that the search or seizure was warrantless and, therefore, *per se* unreasonable unless the state demonstrates otherwise, cites authority in support of the motion, and requests suppression of evidence obtained as a result of the search or seizure 'sufficiently apprise[s]' the court and the adverse party of the arguments relied upon by the moving party."

*State v. Oxford*, 287 Or App 580, 583, 403 P3d 528 (2017) (brackets in original; internal citation omitted).

However, attorneys who craft motions to just barely cross the minimal threshold of UTCR 4.060 play a risky game. Points and authorities motions that offer no legal argument, like the motion here, while potentially complying with UTCR 4.060 in some instances, may nevertheless be

inadequate to preserve an argument for appeal. Appellate preservation is not something that can be reduced to "a neat verbal formula." *State v. Walker*, 350 Or 540, 548, 258 P3d 1228 (2011). Rather, the rule of appellate preservation is a practical rule, "and close calls *** inevitably will turn on whether, given the particular record of a case, the court concludes that the policies underlying the rule have been sufficiently served." *State v. Parkins,* 346 Or 333, 341, 211 P3d 262 (2009).

The rule of preservation "gives a trial court the chance to consider and rule on a contention, thereby possibly avoiding an error altogether or correcting one already made, which in turn may obviate the need for an appeal." *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008). The rule also ensures fairness to opposing parties, by requiring that "the positions of the parties are presented clearly to the initial tribunal" so that "parties are not taken by surprise, misled, or denied opportunities to meet an argument." *Davis v. O'Brien*, 320 Or 729, 737, 891 P2d 1307 (1995).

Here, nothing in defendant's written motion sufficiently apprised either the state, or the trial court, of the *Arreola-Botello* subject matter limitation argument that she advances on appeal. And our review of the hearing on the motion before the trial court shows no indication that the bare bones written motion was supplemented by *Arreola-Botello*-style arguments. Rather, the arguments at the suppression hearing, understandably, tracked the law in effect at the time under *Rodgers/Kirkeby*. Accordingly, the subject matter limitation argument advanced on appeal is unpreserved. That does not, however, end our inquiry.

We ordinarily will not proceed to the question of plain error unless an appellant has explicitly asked us to do so. *See, e.g.*, *State v. Hammond*, 218 Or App 574, 583-84, 180 P3d 137 (2008) (not addressing the question of plain error where the "defendant does not argue that the matter in dispute satisfies the requisites of 'plain error' as prescribed in *State v. Brown*, 310 Or 347, 355-56, 800 P2d 259 (1990), and that substantial considerations militate in favor of the affirmative exercise of the discretion").

However, in *State v. Tilden*, 252 Or App 581, 589-90, 288 P3d 567 (2012), we identified the rare situation in which we will engage in plain error review, even when it is not expressly asked for by the appellant:

"In this case, however, although defendant's brief does not contain the words 'plain error' or citation to ORAP 5.45, defendant has nonetheless satisfied the requisites of ORAP 5.45 regarding a claim of error apparent on the record and has met his burden of demonstrating that type of error in his opening brief. \*\*\* Here, defendant has identified the ruling, \*\*\* specified the state of the proceedings (he made a motion for a judgment of acquittal, but not on the correct grounds), and set forth pertinent quotations not only where his motion for a judgment of acquittal was denied (again, on different grounds than those now argued by defendant) but also the portions of the record where the trial court considered the 'control' question with regard to an evidentiary ruling, thereby demonstrating that the court was generally apprised of the issue, albeit in a different procedural context.

"More importantly, though, defendant complied with the requirement in ORAP 5.45(6) that his 'argument in support of a claimed error apparent on the record shall demonstrate that the error is of the kind that may be addressed by the court without the claim of error having been preserved in the record'—in other words, he demonstrated that the argument satisfies the legal test for plain error."

Relying upon *Tilden*, we also exercised plain error review despite no express request by the appellant in *State v. Hoseclaw*, 299 Or App 334, 341, 450 P3d 1005 (2019), where there had been a significant change in the law between the time of the trial court ruling and the appeal. In that case, we noted:

"Defendant believed his claim of error to have been preserved, and he did not request plain-error review. Although we ordinarily do not undertake plain-error review in the absence of an explicit request, this is the rare situation, like in *State v. Tilden*, 252 Or App 581, 589, 288 P3d 567 (2012), where defendant's brief, in light of subsequent case law, has nonetheless satisfied the requisites of ORAP 5.45 regarding a claim of error apparent on the record."

*Hoseclaw*, 299 Or App at 341.

As in *Tilden* and *Hoseclaw*, and in light of our approach to changes in the law between trial and appeal as articulated in *Jury*, 185 Or App at 136, we conclude that considering the issue under our plain error doctrine is appropriate in this case. *Accord State v. Ulery*, 366 Or 500, 503, 464 P3d 1123 (2020) ("Whether an error occurred is generally determined by the law at the time of the appellate decision, and nothing in our cases or the text of ORAP 5.45(1) indicates that plain error review incorporates its own nonretroactivity rule."); *State v. Zavala*, 361 Or 377, 380 n 1, 393 P3d 230 (2017) ("When used to describe a trial court's ruling that was not erroneous under existing law, the term 'plain error' is a misnomer; it does not imply any mistake by a trial court. Instead, it is a label that an appellate court uses when it decides that a party is entitled to a benefit of a change in the law."). Here, as the state essentially concedes, the trial court's error is apparent on the face of the record in light of subsequent case law.

Article I, section 9, of the Oregon Constitution establishes the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." "[W]hen a motorist is stopped for a traffic infraction, that stop implicates Article I, section 9." *Areolla-Botello*, 365 Or at 701. "[U]nder Article I, section 9, as under ORS 810.410(3)(b), police authority to detain a motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should be completed." *State v. Watson*, 353 Or 768, 778, 305 P3d 94 (2013) (internal quotation marks omitted).

In *Arreola-Botello*, the Supreme Court rejected the unavoidable lull doctrine, holding that "all investigative activities, including investigative inquiries, conducted during a traffic stop are part of an ongoing seizure and are subject to both subject-matter and durational limitations." 365 Or at 712. Accordingly, "an officer is limited to investigatory inquiries that are reasonably related to the purpose of the traffic stop or that have an independent constitutional justification." *Id*. An "'unavoidable lull' does not create an opportunity for an officer to ask unrelated questions, unless the officer can justify the inquiry on other grounds." *Id*.

The *Arreola-Botello* rule is clear: Officers conducting a traffic stop may only conduct investigation unrelated to that traffic stop if they have independent constitutional justification for further inquiries. Neither line of inquiry here (first, whether defendant had drugs, and second whether she illegally possessed a gun) was related to the basis of the traffic stop. The only remaining question is whether that nontraffic-stop-related inquiry was justified by reasonable suspicion of a crime. It plainly was not.

"To be lawful, an extension of a traffic stop to conduct a criminal investigation must be justified by reasonable suspicion of criminal activity." *State v. Barber*, 279 Or App 84, 89, 379 P3d 651 (2016). Although the standard for reasonable suspicion is "less than the standard of probable cause to arrest," a "stop is unlawful unless it meets an objective test of reasonableness based on observable facts." *State v. Holdorf*, 355 Or 812, 823, 333 P3d 982 (2014). Reasonable suspicion exists when the officer "subjectively believes that the person has committed or is about to commit a crime and that belief is objectively reasonable in light of the totality of the circumstances existing at the time of the stop. To be objectively reasonable, the officer's suspicion must be based on specific and articulable facts." *State v. Maciel*, 254 Or App 530, 535, 295 P3d 145 (2013) (internal citations omitted). Here, the state has the burden of proving that the officers reasonably suspected defendant possessed illegal drugs. *See State v. Guest*, 207 Or App 395, 399, 142 P3d 482 (2006).

There is no dispute that Gardner lacked reasonable suspicion that defendant had drugs. In *State v. Rutledge*, 243 Or App 603, 606, 610, 260 P3d 532 (2011), we held that officers did not have reasonable suspicion to justify a stop where the defendant had just left a motel believed to be a site of drug activity, was "in a car with a person suspected of drug activity," and had a "nervous attitude" about her purse. In contrast, in *State v. Clink*, 270 Or App 646, 652, 348 P3d 1187 (2015), we held that the state established reasonable suspicion where a named informant reported seeing the defendant smoking something in a car, and the state had other information, namely, the defendant was with a known drug user and was making "furtive gestures." Reavis's suspicion was less reasonable than that in either of those cases.

Additionally, the state offers no argument that the questioning was permissible based on officer safety concerns. In *State v. Jimenez*, 357 Or 417, 426-30, 353 P3d 1227 (2015), an officer did not have reasonable suspicion to ask a person about weapons during a traffic stop where he had spent some time talking to the defendant before asking about weapons and did not testify to circumstance-specific fears for his safety. Here, the ammunition in this case was far from defendant's reach in the trunk. No weapon was observed. Defendant made no threats. She was not hostile. Nothing indicates that the encounter was anything other than collegial. Reavis and defendant had been speaking amicably for several minutes before Reavis asked to search her purse and defendant had allowed Reavis to put her purse on the roof of the car. In short, the record is plainly insufficient to show that Reavis was subjectively reasonably concerned for his safety, let alone that any such concerns, even if they existed, would be objectively reasonable; and, again, the state does not argue otherwise.

Accordingly, we conclude that the deputies' questions here violated defendant's rights under Article I, section 9. In light of *Arreola-Botello*, the error is apparent on the record, and the state does not contend otherwise. We exercise our discretion to address the error. Defendant's constitutional rights are affected, and defendant's conviction was obtained, in part, based on evidence derived from that constitutional violation. Although defendant did not preserve the argument made on appeal, defendant did not encourage the error, nor does the failure to raise the correct argument reflect a strategic choice. And, as in *Ulery*, "given the trial court's inability to correct the error under controlling law, the fact that it was not given an opportunity to do so does not weigh heavily." 366 Or at 504; *State v. Fults*, 343 Or 515, 523, 173 P3d 822 (2007).

Reversed and remanded.