Argued and submitted June 18, 2020, affirmed January 6, petition for review denied April 22, 2021 (368 Or 37)

In the Matter of T. T.,
a Youth.

STATE OF OREGON,
*Respondent,*

*v.*

T. T.,
*Appellant.*

Multnomah County Circuit Court
17JU09608;
Petition Number 171031313;
A168707

479 P3d 598

Youth was a backseat passenger in a car that was pulled over for speeding. A state trooper smelled marijuana and investigated, and he eventually searched the car and discovered large bags of marijuana in the trunk. Based on that evidence and other admissions by youth, the juvenile court found youth to be within its jurisdiction for acts that, if committed by an adult, would constitute unlawful delivery of a marijuana item and unlawful possession of marijuana by a person under the age of 21. On appeal, youth assigns error to the denial of his motion to suppress, arguing that the trooper lacked reasonable suspicion to turn the traffic stop into a drug investigation and, in any event, lacked probable cause to search the vehicle. The primary issues on appeal are (1) whether the traffic stop unlawfully turned into a drug investigation when the trooper asked where they were coming from and how long they had been there; (2) if not, whether the trooper, at a later point in the traffic stop, had reasonable suspicion to ask the driver and youth to get out of the vehicle for a drug investigation; and (3) if the traffic stop was lawfully converted into a drug investigation, whether the trooper developed probable cause to search the car under the automobile exception to the warrant requirement. *Held*: Youth failed to preserve his argument that the stop was illegal at the point of the trooper's initial inquiry about their travel, and the questions raised by youth in light of the Supreme Court's decision in *State v. Arreola-Botello*, 365 Or 695, 451 P3d 939 (2019), are not obvious for purposes of plain-error review. With regard to reasonable suspicion later in the traffic stop, because it was lawful for persons 21 and over to possess some amount of marijuana in Oregon at the time of the stop, the odor of usable marijuana in the vehicle was unremarkable, and the fact that the marijuana was not on the driver's person did not make it objectively reasonable to believe that the underage passengers were the ones in possession of it—let alone that the driver had delivered it to them unlawfully. But the trooper had reasonable suspicion of a different crime. As to reasonable suspicion of drug trafficking, four of the facts identified by the trooper were drug-courier profiling facts, which are accorded minimal weight under the Oregon Constitution, unlike the role they play in a reasonable suspicion analysis under the Fourth Amendment. However, here, those facts, bolstered by the additional facts of the vehicle's unusual travel pattern and the

driver's effort to conceal that pattern, were enough to create reasonable suspicion of drug trafficking. With additional information from questioning the driver and passengers, the trooper had probable cause to search the car under the automobile exception.

Affirmed.

Xiomara Y. Torres, Judge.

Christa Obold Eshleman argued the cause for appellant. On the brief was Matthew J. Steven.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and James, Judge, and Kamins, Judge.

JAMES, J.

Affirmed.

**JAMES, J.**

Youth was a backseat passenger in a car that was pulled over for speeding. A state trooper smelled marijuana and investigated, and he eventually searched the car and discovered large bags of marijuana in the trunk. Based on that evidence and other admissions by youth, the juvenile court found youth to be within its jurisdiction for acts that, if committed by an adult, would constitute unlawful delivery of a marijuana item and unlawful possession of marijuana by a person under the age of 21.

On appeal, youth assigns error to the denial of his motion to suppress, arguing that the trooper lacked reasonable suspicion to turn the traffic stop into a drug investigation and, in any event, lacked probable cause to search the vehicle. The primary issues before us end up being threefold: (1) Did the traffic stop unlawfully turn into a drug investigation when the trooper asked where they were coming from and how long they had been there? (2) If not, did the trooper, at a later point in the traffic stop, have reasonable suspicion to ask the driver and youth to get out of the vehicle for a drug investigation? And (3), if the traffic stop was lawfully converted into a drug investigation, did the trooper develop probable cause to search the car under the automobile exception to the warrant requirement? As discussed below, we conclude that youth failed to preserve his argument that the stop was illegal at the point of the trooper's initial inquiry about their travel; that the trooper asked the driver and youth to get out of the car after developing reasonable suspicion that the car and its occupants were involved in importing marijuana from California; and that, with additional information from questioning the driver and passenger, the trooper had probable cause to search the car.

## I.   BACKGROUND

In reviewing the denial of a motion to suppress evidence, we are bound by the juvenile court's factual findings to the extent that those findings are supported by evidence in the record. *State v. Arreola-Botello*, 365 Or 695, 697, 451 P3d 939 (2019). In this case, the juvenile court made express

findings of fact, which youth does not challenge on appeal. Those facts are as follows:[1]

"Youth was a passenger in the vehicle that was lawfully stopped for speeding on Interstate 5 [on October 31, 2017]. It was stopped going about 80 miles an hour in a 60 miles an hour zone ***. The vehicle was northbound, was traveling northbound near mile post 254. Trooper Smith from the Oregon State Police testified he observed three males in the vehicle. Two in the front seat, one in the back seat.

"The passenger in the front and the passenger in the rear appeared to be to the trooper under the age of 18. As Trooper Smith *** walked over around to the front-passenger window—[it] may have been the rear-passenger window, but to the passenger window, he smelled the strong odor of green, non-smoked marijuana. He did not see marijuana in the car.

"Trooper Smith has been employed with the Oregon State Police for three and a half years. He testified that due to his training and experience, he is familiar with the smell of both burnt marijuana and the smell of dry green marijuana. He testified there is a marked difference between [the] two.

"He did ask the driver, who was an adult, for his license, registration, and proof of insurance. [The driver told Trooper Smith that the vehicle was a rental car and that he had to grab the rental agreement]. While the driver was looking for [the requested documents, Trooper Smith asked the driver where they were coming from and how long they had been there. The driver] told Trooper Smith they were coming from Redding, California and that they had been there a couple of days.

"When Trooper Smith saw the rental agreement, he noticed that the vehicle had just been rented on the 29[th], the day before [at] the Portland airport.

"Based on his training and experience, Trooper Smith testified that it's common to use rental cars to traffic [drugs]. Trooper Smith asked the driver, the adult, who was age 25 to step out of the car. As he exited, he noticed

_____

[1] Here, and later in our discussion, we have supplemented the juvenile court's express findings to give them further context. In doing so, we presume that the juvenile court resolved any factual disputes in a manner consistent with its ultimate conclusion. *See Arreola-Botello*, 365 Or at 697.

the smell of air freshener coming from the vehicle, and as he walked to the back of the vehicle with the driver, he could not smell marijuana on the driver.

"He was [suspicious that] the adult driver was furnishing marijuana to the juvenile passengers. He asked the driver to clarify his questions about the trip to California. The driver's answers were vague. Trooper Smith did request a cover call. He asked to speak to the youth outside, the youth outside the car so he can talk to him[, and youth got out of the vehicle]. ***.

"Trooper Smith asked the youth questions about the trip. The youth gave a different story than the driver. The passenger in the front seat gave a third version of the story.

"The driver was asked why the stories were so different. He then admitted that he had received an ounce of marijuana in the State of California.

"Trooper Smith searched the vehicle, located luggage bags in the trunk, three large bags which contained a large amount of marijuana which turned out to be approximately 39 pounds. A pistol was found under [the] marijuana.

"In the center console Trooper Smith found a small bag of marijuana. All three occupants of the vehicle were placed under arrest. Trooper Smith found $1,705 in cash in the youth's possession."

Based on those events, the state petitioned the juvenile court to find youth within its jurisdiction for acts that, if committed by an adult, would violate ORS 475.346 (unlawful delivery of a marijuana item) and ORS 475.341 (unlawful possession of marijuana by a person under the age of 21). Youth then moved to suppress the state's evidence, arguing that the trooper's investigation of drug crimes and search of the vehicle violated his rights under Article I, section 9, and the Fourth Amendment. He argued that, rather than citing the driver "for speeding and letting the vehicle go, Trooper Smith ordered [the driver] out of the vehicle and made unrelated inquiries about drugs, having no reasonable suspicion or probable cause to do so, given that marijuana is legal to possess for [the driver], a 25-year-old." And, following that illegality as to the driver, the trooper ordered youth out of the car and unlawfully questioned him about their travels.

With regard to the search of the trunk, youth argued that, "[g]iven that marijuana is legal for adults 21 years of age and older, odor of marijuana alone is no longer enough to establish probable cause of criminal activity." Thus, youth sought to suppress "all evidence gained from the illegal search, including the marijuana and firearm found in the center console and trunk of the vehicle, as all evidence was obtained in violation of Article I, section 9 of the Oregon Constitution, and the Fourth and Fourteenth Amendments to the United States Constitution."

The state contended that, regardless of whether adults can possess marijuana, it remains illegal to furnish it to minors, which is what the trooper reasonably suspected was happening at the point that the traffic stop turned into a drug investigation. And, the state argued, once the driver stepped out of the vehicle and did *not* smell of marijuana, the trooper had probable cause to believe that there was marijuana "in the vehicle and therefore in the possession of the juveniles." The state further argued that the trooper had reasonable suspicion that the driver was trafficking drugs and that the driver's eventual admission that he had imported marijuana from California into Oregon supplied probable cause to believe that the driver was violating ORS 475B.227 (2017), *amended by* Or Laws 2018, ch 103, § 21 (importing and exporting marijuana), thereby providing an independent basis for searching the vehicle.

The juvenile court denied youth's motion. It stated that youth was stopped at the moment that he was told to leave the car but concluded that "the stop of the youth was supported by reasonable suspicion of criminal activity, *i.e.*, the possession of marijuana." The court further ruled that the search of the trunk fell within the automobile exception to the warrant requirement, because "Trooper Smith had probable cause to believe that the vehicle contained contraband, a large amount of marijuana based on the smell." After the court denied the motion, youth admitted to additional factual allegations, conditioned on his right to appeal the suppression ruling. Based on the evidence discovered during the stop and youth's admissions, the court found youth within its jurisdiction.

Youth appealed that judgment, assigning error to the denial of his suppression motion. In his opening brief, youth argued that the trooper "immediately expanded the investigation beyond the traffic stop to ask about the purpose of the trip," which violated Article I, section 9, because there was no objectively reasonable belief that a crime was being committed at that point. Youth also argued, as he had below, that the trooper's belief that youth—as opposed to the driver—was in possession of the marijuana was not objectively reasonable. Additionally, youth argues that the probable cause standard was not met by the facts known to the trooper—namely, a strong odor of green marijuana in a car driven by an adult, a car rental receipt that suggests that the driver was in California for less time than he reported, inconsistent stories among the car's occupants, the vehicle's direction of travel, and an odor of air freshener or cologne.

The state responded that the stop was lawful under the state and federal constitutions at each point in time: the initial traffic stop was lawful, based on the trooper having observed the driver speeding; the driver, "during a lull while he was searching for registration and proof of insurance," told the trooper that they had driven down to Redding, California, had stayed there for a couple of days, which turned out to be inconsistent with the rental agreement for the vehicle; that information, plus the strong odor of green marijuana, gave the trooper reasonable suspicion to extend the stop of the driver and to question youth; and, with additional information obtained from youth and the driver, including inconsistencies in their stories and an admission from the driver that he had brought an ounce of marijuana from California, the trooper had probable cause to search the vehicle.

After the parties briefed the case, the Supreme Court decided *Arreola-Botello*, holding that, under Article I, section 9, "all investigative activities, including investigative inquiries, conducted during a traffic stop are part of an ongoing seizure and are subject to both subject-matter and durational limitations," such that "an officer is limited to investigatory inquiries that are reasonably related to the purpose of the traffic stop or that have an independent

constitutional justification." 365 Or at 712.  Following that decision, youth filed a memorandum of additional authorities, asserting that "*Arreola-Botello* supports youth's argument that the officer violated Article I, section 9, of the Oregon Constitution by expanding the investigation beyond the traffic stop to ask about the purpose of the trip," and that it "likewise negates the State's argument that the officer was justified in asking these questions due to a 'lull' while the driver was looking for his documents."

## II.  ANALYSIS

In both the juvenile court and this court, the parties have not always carefully delineated between Article I, section 9 and the Fourth Amendment, or between the legal significance of the stop of the *driver* and the stop of *youth*. But, as we have noted,

> "in Oregon, a passenger in a vehicle that is stopped by police is Schrödinger's passenger—he exists in two potential states, both seized and not seized, and only one of those potential states becomes reality depending on the lens through which we observe him. Viewing the encounter through the lens of Article I, section 9, the passenger is not seized when the vehicle is stopped. * * * In contrast, viewing the encounter through the lens of the Fourth Amendment, 'a police officer effectively seizes "everyone in the vehicle," the driver and all passengers' for the duration of a traffic stop. *State v. Bailey*, 356 Or 486, 507, 338 P3d 702 (2014) ([quoting] *Arizona v. Johnson*, 555 US 323, 327, 129 S Ct 781, 172 L Ed 2d 694 (2009); *Brendlin v. California*, 551 US 249, 255, 127 S Ct 2400, 168 L Ed 2d 132 (2007))."

*State v. Kamph*, 297 Or App 687, 691-92, 442 P3d 1129 (2019) (some internal quotation marks omitted).

The opening question in virtually any reasonable suspicion or probable cause inquiry is identifying the point in time when the alleged constitutional violation occurred. Identifying that point in time is what enables the parties, and the court, to consider the correct universe of facts at play. In the context of a traffic stop in Oregon, because federal law and state law diverge with respect to when a passenger is seized, which can, in turn, affect the point in time of the potential constitutional violation, and accordingly

what universe of facts are considered in evaluating reasonable suspicion or probable cause, we address the state and federal constitutional issues separately.

A.   *Article I, Section 9*

Article I, section 9, of the Oregon Constitution provides:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Under our well established "first things first" approach, any discussion of a potential federal constitutional violation is premature until we determine "whether the state's law *** has deprived defendants of the rights they seek to vindicate under the United States Constitution." *State v. Babson*, 249 Or App 278, 307, 279 P3d 222 (2012), *aff'd*, 355 Or 383, 326 P3d 559 (2014). Accordingly, we begin with assessing the stop in this case under Article I, section 9 because "the state does not deny any right claimed under the federal Constitution when the claim before the court in fact is fully met by state law." *Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981).

1.   *Were the driver and youth seized for a drug investigation before being asked to get out of the vehicle?*

We begin with a brief overview of the principles that apply to traffic stops under Article I, section 9, which establishes "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." Under that provision, a seizure occurs when (1) a police officer intentionally and significantly interferes with an individual's liberty or freedom of movement; or (2) a reasonable person, under the totality of the circumstances, would believe that his or her liberty or freedom of movement has been significantly restricted. *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010).

A motorist can be stopped based on probable cause of a traffic infraction, ORS 810.410, and "that stop implicates

Article I, section 9, because[,] 'in contrast to a person on the street, *** the reality is that a motorist stopped for a traffic infraction is legally obligated to stop at an officer's direction *** and to interact with the officer, *** and therefore is not free unilaterally to end the encounter and leave whenever he or she chooses.'" *Arreola-Botello*, 365 Or at 701 (quoting *State v. Rodgers/Kirkeby*, 347 Or 610, 622-23, 227 P3d 695 (2010)). All investigative activities during a traffic stop are part of an ongoing seizure of the driver and are subject to durational and subject-matter limitations—that is, "all such activities including inquiries, must be reasonably related to the purpose of the traffic stop or supported by an independent constitutional justification." *State v. Sheriff*, 303 Or App 638, 647, 465 P3d 288 (2020) (citing *Arreola-Botello*, 365 Or at 712-13, and *State v. Watson*, 353 Or 768, 778-82, 305 P3d 94 (2013)). In other words, a traffic stop is a traffic stop, not an opportunity for a fishing expedition:

> "If, after stopping an individual based on probable cause that the individual committed a traffic offense, an officer may inquire into criminal activity without reasonable suspicion of a specific crime, an officer will have less of an incentive to develop the requisite reasonable suspicion of that crime which ordinarily would be required to stop the individual for a temporary criminal investigation. By applying subject-matter limitations to investigative activities and questioning, Article I, section 9, ensures that officers do not turn minor traffic violations into criminal investigations without a constitutional basis for doing so."

*Arreola-Botello*, 365 Or at 713.

The stop of a driver does not, *in and of itself*, result in a seizure of all passengers under Oregon's constitution. *State v. Stevens*, 364 Or 91, 100, 430 P3d 1059 (2018). In *Stevens*, the court reaffirmed that "a reasonable suspicion that a driver has committed a traffic or other offense does not justify a categorical limitation on the passenger's freedom and that an officer may not seize a passenger without a constitutional justification for doing so." *Id*. By implication, "the passengers in a car stopped for a traffic or criminal offense would not understand that the officer's show of authority in stopping the driver extended to them." *Id*.

Therefore, for a passenger to be stopped, there must be something more than the bare fact that the driver was pulled over for a traffic violation. The circumstances must be such that passengers, under the totality of the circumstances, would understand that the officer's show of authority in stopping the driver extended to them or that the officer was independently restricting their movement apart from the stop of the driver. *Id.* (citing *State v. Backstrand*, 354 Or 392, 401, 313 P3d 1084 (2013) ("What is required is a reasonable perception that an officer is exercising his or her official authority to restrain.")).

Youth's arguments before the juvenile court under Article I, section 9, were premised on the view that the driver and youth had been seized unlawfully at the moment that they were asked to get out of the car for questioning. For example, he explained, "Now, after [the driver] is pulled out of the vehicle, then [youth] is pulled out of the vehicle. And under both Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution, that action is significant because it restricts his freedom of movement, restricts his liberty."

On appeal, and particularly during oral argument, when he had the benefit of *Arreola-Botello*, youth took a different position, contending that the lawful traffic stop turned into an unlawful drug investigation even earlier—*prior* to the trooper asking them to exit the car—when the trooper asked the driver where they were coming from and how long they had been there. He now argues that the trooper's questions to the driver effectuated a stop of the passengers as well, because the inquiry was directed at the activities of all occupants in the vehicle, not just the driver; the stop occurred at night and on the highway; and the passengers were juveniles who were dependent on the driver and could not simply walk away. Under the totality of the circumstances, youth argues, he was not free to leave once the trooper signaled that the investigation went beyond a traffic stop by exceeding the subject-matter limitations recognized in *Arreola-Botello*.

The state responds that youth did not preserve that contention before the juvenile court, and we agree. Nothing

in youth's written motion or arguments at the suppression hearing put the state or the juvenile court on notice of an argument that the trooper's questions to the driver about where they were coming from had transformed the stop of the driver into a stop of the passengers, alone or in combination with any of the other attendant circumstances (that the passengers were juveniles in a car pulled over on the freeway at night). *See State v. Hallam*, 307 Or App 796, 803, 479 P3d 545 (2020) (concluding that the appellant had not preserved a challenge based on the reasoning in *Arreola-Botello* where the written motion and arguments at the suppression hearing "understandably, tracked the law in effect at the time"). Once again, youth's argument below was that an otherwise lawful traffic stop turned into an unlawful drug investigation when the trooper asked the driver and then youth to get out of the vehicle for questioning.

Youth's unpreserved contentions involve important and novel issues about what questions exceed the subject limits on a traffic stop. Whether Schrödinger's passenger continues to exist under the Oregon Constitution in the wake of *Arreola-Botello*, and even if so, whether previous cases holding that an *adult* passenger isn't stopped for purposes of Article I, section 9 extend to a *juvenile* passenger in a car driven by an adult, are complex questions. The answers to those questions are not obvious and beyond reasonable dispute on this record, and we will not review them as plain error. *Cf. Hallam*, 307 Or App at 805 (reversing, notwithstanding the lack of a request for plain-error review, where the state "essentially concede[d]" that the trial court plainly erred in light of *Arreola-Botello*). We therefore turn instead to the question presented to the juvenile court: whether the facts, as known to the trooper when he asked the driver and youth to get out of the car, gave rise to reasonable suspicion.

2.  *Was the drug investigation supported by reasonable suspicion?*

"[T]he established standard for reasonable suspicion supporting an investigatory stop of a defendant is met when an officer can point to specific and articulable facts that give rise to a reasonable inference that the defendant committed or was about to commit a specific crime or type

of crime." *State v. Maciel-Figueroa*, 361 Or 163, 165, 389 P3d 1121 (2017). The officer must have a subjective belief that the person stopped has committed, or is about to commit, the specific crime or type of crime, and that belief must be objectively reasonable under the totality of the circumstances. *State v. Kreis*, 365 Or 659, 665, 451 P3d 954, 960 (2019); *see also Maciel-Figueroa*, 361 Or at 181 ("[T]his court has never concluded that an officer had reasonable suspicion to stop an individual based on nonspecific 'criminal activity.'").

As the Oregon Supreme Court made clear in *Maciel-Figueroa*,

> "[a] specific type of crime, for example, can be criminal mischief, assault, theft, or kidnapping, with the differences in the degrees of the crimes being immaterial to whether the officers have reasonable suspicion. Another set of examples of a specific type of crime is the possession or the delivery of a controlled substance. In those cases, the difference between whether the substance is cocaine rather than methamphetamine is also immaterial to the analysis of reasonable suspicion."

361 Or at 180.

Under *Maciel-Figueroa*, when considering the question of reasonable suspicion, we must ask reasonable suspicion of *what*? The Oregon Constitution demands a level of particularity to the subjective reasonable suspicion possessed by an officer. It is insufficient for an officer to have reasonable suspicion of a "crime," or "criminal conduct" broadly. Likewise, it is insufficient for an officer to have reasonable suspicion of "drugs," or "narcotics crimes" generally. The range of the criminal code dealing with narcotics is broad, encompassing many different types of activity. Just as there is a difference between "criminal mischief, assault, theft, or kidnapping," *Id.*, so too, there is a difference between possession, delivery, manufacture, or interstate transport. Reasonable suspicion of one does not create blanket suspicion for them all.

Although requiring less than probable cause, reasonable suspicion must be based on more than mere speculation. *See State v. Holdorf*, 355 Or 812, 822-23, 333 P3d 982 (2014) (articulating standard). That is, the state "need

not prove that the articulated facts give rise to a conclusion with certainty that a crime has occurred or is about to occur," but, "based on the specific facts known and articulated by the officer, a reviewing court must conclude that the officer's subjective belief could be true, as a matter of logic." *Maciel-Figueroa*, 361 Or at 184 (emphasis omitted).

An officer's suspicion of the specific crime or type of crime cannot be based on a hunch but must be particularized to the individual based on the individual's own conduct. *Kreis*, 365 Or at 665 (citing *State v. Miglavs*, 337 Or 1, 12-13, 90 P3d 607 (2004)). The standard incorporates "a proper regard for the experience that police officers bring with them when they encounter criminal suspects," *Holdorf*, 355 Or at 827-28, but the officer must be able to point to observable facts like "distinctive behavior" associated with unlawful activity that permits the officer "to make a reasonable inference based on the officer's pertinent training and experience" that the specific crime or type of crime is afoot. *State v. Walker*, 277 Or App 397, 402, 372 P3d 540, *rev den*, 360 Or 423 (2016) (internal quotation marks omitted); *State v. Aguilar*, 307 Or App 457, 469-70, 478 P3d 558 (2020) ("training and experience is not, in and of itself, a specific and articulable fact" that can provide sufficient proof of reasonable suspicion (internal quotation marks omitted)). In other words, as a practical matter, "the distinction between an officer's improper reliance solely on intuition and the officer's permissible reliance on reasonable suspicion of criminal activity reduces largely to the officer's ability to identify and describe the observable facts that lead the officer—in light of the officer's training and experience—to suspect that a person has committed, is committing, or is about to commit a crime." *Walker*, 277 Or App at 402.

Importantly, "[a] court's review of a stop is based on the record made concerning the officer's actual belief that the defendant may have committed a crime, and the basis for that belief—the specific facts, articulated by the officer, that led him or her to believe that the defendant may have committed a crime, which we then review as a matter of law for objective reasonableness." *Maciel-Figueroa*, 361 Or at 183 (internal citation omitted). We therefore begin by examining what the trooper identified as his subjective belief of

a specific crime—in this case, two crimes. At the suppression hearing, the trooper testified that, by the time that he asked the driver and then youth to get out of the car, he was conducting two different criminal investigations: "The first would be possession of marijuana by minors," and "the second would be import of marijuana from California to Oregon." Although we understand the juvenile court to have relied on the former to conclude that "the stop of the youth was supported by reasonable suspicion of criminal activity, *i.e.*, the possession of marijuana," we conclude that only the latter provided a lawful basis on which to seize youth and the driver as part of a drug investigation.[2]

     a.   Evidence of the odor of marijuana generally

     Previously, we have rejected arguments that nonqualified testimony about the smell of marijuana would fail to establish reasonable suspicion. However, our reasoning was dependent upon the legal status of marijuana as contraband in *any* amount:

> "Defendant does not argue that marijuana becomes contraband only in quantities of more than an ounce, and we know of no authority for that proposition. Indeed, both the legal and common definitions of 'contraband' indicate that the term encompasses anything that the law prohibits possessing. *Black's Law Dictionary* defines 'contraband' as '[g]oods that are unlawful to import, export, produce, or possess.' *Id*. at 365 (9th ed 2009); *see also Webster's Third New Int'l Dictionary* 494 (unabridged ed 2002) ('goods or merchandise the importation, exportation, or sometimes possession of which is forbidden'). Marijuana falls within these definitions regardless of its quantity."

*State v. Smalley*, 233 Or App 263, 271, 225 P3d 844, *rev den*, 348 Or 415 (2010). With the changes to the legal status of

---

[2] We note that the state spends little time on appeal defending "possession by youth" as the basis for turning the traffic stop into a drug investigation. Instead, the state casts "possession" as part of the importation issue, arguing that "youth and the other juvenile, who were traveling with [the driver], appeared to be complicit in that crime [of importation], which also would constitute unlawful possession of marijuana by those two." It is unclear from its ruling whether the juvenile court applied that logic or evaluated possession separately. However, because the trooper's subjective suspicion regarding possession by youth appears to have been distinct from whether they were involved in the crime of importing marijuana from California, we discuss them separately.

marijuana in Oregon, the applicability of our reasoning in *Smalley* has narrowed to the few remaining circumstances where quantity does not matter in defining illegal activity. This case presents a circumstance where quantity *does* matter, a circumstance that *Smalley* anticipated might arise in the future but did not address.

Marijuana is now a legal substance for adults for both recreational and medicinal use in Oregon. For recreational use, under ORS 475B.337, any person 21 years of age or older may lawfully possess one ounce or less of usable marijuana in a public place and eight ounces or less of usable marijuana in his or her home. Also, under ORS 475B.301, an adult 21 years or older may possess up to four homegrown marijuana plants.

For medical purposes, a registry identification cardholder and designated primary caregiver may jointly possess up to 24 ounces of usable marijuana. ORS 475B.834(1). Additionally, a registry identification cardholder and the designated primary caregiver of the registry identification cardholder may jointly possess up to six mature marijuana plants and 12 or fewer immature marijuana plants. ORS 475B.831. Furthermore, a grower designated to produce marijuana by a registry identification cardholder may possess the amount of usable marijuana that the grower harvests from mature marijuana plants, not to exceed 12 pounds of usable marijuana per mature plant in outdoor grow sites and six pounds for indoor grow sites, provided that the amount does not exceed the amount reported to the Oregon Health Authority under ORS 475B.816. ORS 475B.834.

In terms of transportation, a recreational user who grows his own marijuana plants may transport them, subject to some limitations. ORS 475B.301. Home growers are limited to "the delivery of not more than one ounce of usable marijuana at a time by a person 21 years of age or older to another person 21 years of age or older for noncommercial purposes." *Id.* Additionally, home growers may deliver up to 16 ounces of cannabinoid products in solid form, 72 ounces of cannabinoid products in liquid form, and 16 ounces of cannabinoid concentrates. *Id.*

In short, under Oregon law, the possession and transport of marijuana, in a variety of amounts and forms, is now legal. Oregon voters' decriminalization of marijuana necessitates our reassessment of the weight to be given to testimony about the smell of marijuana. In making that reassessment we are not alone.

Vermont concluded that the weight of testimony about a smell of marijuana is strongly tied to testimony qualifying that smell.

> "The weight of that factor in determining whether probable cause exists generally depends not only upon the nature and strength of the odor and other factors accompanying the odor, but also how those factors relate to the offense being investigated. While adjectives assessing the strength of an odor may be subjective and unhelpful at times in assessing whether probable cause exists, *see Commonwealth v. Overmyer*, 469 Mass 16, 11 NE3d 1054, 1059 (2014) (stating that 'characterizations of odors as strong or weak are inherently subjective'), the faint smell of burnt marijuana is far less probative as to whether a car contains marijuana than, say, an overpowering odor of fresh marijuana emanating from the trunk of a car."

*Zullo v. State*, 209 Vt 298, 348-49, 205 A3d 466, 502 (2019).

Similarly, Colorado approached the question in the context of dog sniffs. There, the court concluded:

> "Has the passage of Amendment 64 altered this settled terrain? We began to explore this question in our recent decisions in *People v. Zuniga*, 2016 CO 52, 372 P3d 1052, and *People v. Cox*, 2017 CO 8, 401 P3d 509. In both *Zuniga* and *Cox*, we found probable cause supporting an automobile search based on a confluence of factors, including the positive alert of a drug-detection dog that was trained to alert to marijuana. Yet, in *Zuniga*, we concluded that the alert was legally ambiguous because a drug-detection dog can't distinguish legal marijuana from illegal marijuana, or legal marijuana from illegal narcotics. \*\*\* Despite this ambiguity, we held that the alert was still relevant to the overall probable cause analysis. *Id.* Likewise in *Cox*, we concluded that the positive alert of a drug-detection dog was one factor, among many, supporting a finding of probable cause to search a stopped vehicle.

"In both *Zuniga* and *Cox*, we declined to address (1) whether the sniff of a dog trained to detect marijuana was a search, and (2) whether a positive alert from a dog trained to detect marijuana alone could establish probable cause. Significantly however, these two recent decisions suggest the answer to the latter question is no. We acknowledged that, with the legalization of small amounts of marijuana, a dog's alert doesn't provide a yes-or-no answer to the question of whether illegal narcotics are present in a vehicle. At most, the alert could be 'suggestive of criminality,' but not determinative on its own."

*People v. McKnight*, 2019 CO 36, ¶¶ 35-36, 446 P3d 397, 405-06 (Colo 2019).

Like the Colorado and Vermont courts, we must conclude that the change to the legal status of marijuana in Oregon necessitates a change in our consideration of testimony about the smell of marijuana. Previously, the question was binary, yes or no. If marijuana was present, it was unlawful, though the sanction varied from criminal to violation. The smell thus created a reasonable inference of contraband. With legalization, however, the basic question has been altered. The issue is not whether marijuana is present, but whether it is present in an amount *above a particular threshold* that separates legal and illegal conduct. The issue is further complicated by the fact that those thresholds vary depending upon the source of the lawful possession— recreational or medical use. Its presence below that threshold is not simply unlawful activity sanctioned at a lower level, it is entirely lawful conduct.

> b.  Furnishing marijuana to or possession of marijuana by juveniles

For juveniles, however, marijuana is still unlawful in *any* amount. At the relevant time in October 2017, ORS 475B.337(1) applied to unlawful possession of marijuana by persons 21 and older, and it made it unlawful to possess, knowingly or intentionally, "[m]ore than one ounce of usable marijuana in a public place" or "[m]ore than eight ounces of usable marijuana." However, chapter 475B made it unlawful for anyone under 21 to possess *any* amount of marijuana, *see* ORS 475B.316 (making it a violation for person under 21

years of age (except for licensees or licensee representatives) to possess, attempt to purchase, or purchase a marijuana item),[3] and made it unlawful to deliver any amount of marijuana to a person under 21, *see* ORS 475B.346 (making it unlawful for any person to deliver a marijuana item, subject to exceptions in ORS 475B.301, which do not apply to persons under 21).

Accordingly, smell may be more probative of reasonable suspicion in that context. In this case, the trooper testified that, when he first approached the vehicle, he observed that the front seat passenger and rear driver side passenger were "definitely under 21," and that, when the front passenger window was rolled down, the trooper "was able to smell the—a pretty strong odor of marijuana" and tell "that would be the green non-smoked marijuana coming from the vehicle." He also "noted that there was no other luggage except for the backpack on the rear passenger side of the vehicle."

The trooper acknowledged that he was not able to "tell exactly how much [marijuana was present] by odor alone," and that a strong odor "typically means that there's a larger quantity than a user amount"—what the trooper described as "[a] couple of grams, like what would fill up a joint, like an eighth of an ounce." The trooper testified that, based on those facts, he immediately "began to think that since [the passengers] are under 21 years of age they are not allowed to possess marijuana in any form."

The trooper, however, did not identify anything specific about the passengers that would make it reasonable to believe that the smell was coming from marijuana that belonged to them as opposed to the adult driver. In fact, the trooper testified that, at that point, he didn't "have information really to determine whose it is either way." We have explained that, "although an officer is not required to rule out all innocent explanations for a person's conduct before stopping the person, *** [t]he fact that the person's conduct is consistent with criminal activity is not necessarily enough

---

[3] ORS 475B.341(1) applied to persons under 21 and elevated the violation to a misdemeanor if the person possessed, knowingly or intentionally, "[m]ore than one ounce of usable marijuana in a public place" or "[m]ore than eight ounces of usable marijuana," and to a felony for certain greater amounts, ORS 475.341(3).

to give rise to reasonable suspicion." *State v. Martin*, 260 Or App 461, 476, 317 P3d 408 (2014). Where behavior "is consistent with criminal activity, but is not too remarkable, it will not support a stop." *Id.* (internal quotation marks omitted).

Had all of the vehicle occupants been under the age of 21, the smell of marijuana would take on different significance. But, given the legality of an adult possessing some amount of marijuana in Oregon, the smell of marijuana in a car in which an adult is present is no longer remarkable, and, by itself, does not give rise to reasonable suspicion that it is being *unlawfully* possessed by or delivered to an underage passenger. An officer could not reasonably conclude from the smell of fresh tobacco in a car—or even a pack of cigarettes resting on the center console—that the adult driver was unlawfully distributing cigarettes to a minor passenger under ORS 323.482; nor, for that matter, would an unopened six-pack of beer visible in the car, by itself, provide reasonable suspicion that minor children near the beer were in possession of that alcohol. This circumstance is not materially different.

Nor did the trooper learn anything more by the time that youth was asked to get out of the vehicle that would make it reasonable to believe that any marijuana in the car belonged to the passengers rather than the driver. By that point, the trooper also knew that the driver had recently rented the vehicle, he knew that the driver was lying about his trip to California, he "could smell that there was either cologne or like an air freshener smell coming from the vehicle" when the driver exited, and he knew that, when the driver walked back to the front of the patrol car, he "could not smell the odor of the marijuana coming from his person, which made [the trooper] believe that the marijuana was still placed somewhere in the vehicle *and at this point in possession—the minors had possession of the marijuana*." (Emphasis added.)

Setting aside, for the moment, whether the passengers may have been implicated in the crime of importing marijuana (which we discuss below), those circumstances suggested that the marijuana was not on the driver's person—and that the vehicle's occupants wanted to conceal

the odor—but they did little to affirmatively connect possession to the underage passengers as opposed to the driver. The marijuana was just as likely to have belonged to the adult driver but been stored somewhere in the car rather than on his person (a fact that would be consistent with the trooper's own observation that the smell was not from an amount that typically would be located in a pocket). Again, considering that it is lawful for persons 21 and over to possess some amount of marijuana in Oregon, the odor of usable marijuana in the vehicle was unremarkable, and the fact that the marijuana was not on the driver's person did not make it objectively reasonable to believe that the underage passengers were the ones in possession of it—let alone that the driver had delivered it to them unlawfully. Those possibilities involve speculation about missing facts, not reasonable inferences from the observed facts.

c.   Importing marijuana

That brings us to the second basis that the trooper articulated for seizing the driver and youth as part of a drug investigation: whether the trooper, at the time he asked them to get out of the vehicle, had reasonable suspicion that the car and its occupants were importing marijuana from California to Oregon.

At the time of the traffic stop, ORS 475B.227(2) provided that "[a] person may not import marijuana items into this state or export marijuana items from this state." For purposes of that statute, "export" included "placing a marijuana item in any mode of transportation for hire, such as luggage, mail or parcel delivery, even if the transportation of the marijuana item is intercepted prior to the marijuana item leaving this state." ORS 475B.227(2). Critically, ORS 475B.227(2) is not limited by quantity. Unlike general delivery or possession, which is unlawful only when done in quantities above a particular threshold, importation or exportation of *any amount* of marijuana is illegal in Oregon.

As summarized in the state's brief, the trooper specifically identified that statute as a basis for his drug investigation, and he identified the following facts, which he knew at the time that he asked the driver and then youth to

step out of the vehicle, as contributing to his suspicion that it had been violated:

- They were traveling I-5 which the trooper believed to be a "heavy trafficking area." As the trooper testified, "I-5 is used a lot to transport marijuana."

- Their trip was to northern California. As the trooper testified, "California, especially northern California is a source area for marijuana."

- They were traveling in a rental car, and, according to the trooper it is "common for individuals that are trafficking drugs to use a rental car to effectuate that."

- There was nothing visible in the vehicle to suggest a long trip. According to the trooper "usually if people are coming on a long trip, there's bags in the car, there's pillows, blankets, you know, food, scraps, wrappers, things like that, and there was nothing in his car."

- There was a "pretty strong odor" of green marijuana coming from the vehicle.

- The driver had "lied about how long he had been in California."

- According to the trooper, "the quick turnaround time is very unusual for somebody to drive 7 hours—7 plus hours to Redding, California, to turn around and drive 7 plus hours back just a few hours later. From my training and experience, that typically is used by people who are transporting drugs, just making quick trips down to get the product and come back up."

The first four of those facts—those concerning the point of origin, destination, mode of travel, and type and quantity of luggage, etc.—are based on what is known as the drug courier profile. In examining the proper weight that those factors bear under Article I, section 9, the evolution of federal case law regarding profiling facts provides a helpful framing, and, importantly, a helpful constitutional contrast

for how Oregon's approach has diverged from recent Fourth Amendment cases.

In *Reid v. Georgia*, 448 US 438, 441, 100 S Ct 2752, 65 L Ed 2d 890 (1980), the Court considered whether information consistent with a drug courier profile could suffice to create reasonable suspicion for a stop. There, the defendant, Reid, arrived in Atlanta, Georgia, on a commercial flight originating in Fort Lauderdale, Florida. As passengers exited the plane, they were observed by a DEA agent. Not far from Reid in the line was another man carrying a shoulder bag similar to Reid's. As the passengers proceeded through the concourse past the baggage claim area, Reid occasionally glanced in the direction of the other man. When the two men reached the main lobby of the terminal, the second man caught up with Reid and they spoke briefly. The two men then left the terminal together.

A DEA agent approached Reid and his companion outside of the building, identified himself as a DEA agent, and asked them to display their identification and ticket stubs. Both men complied. The tickets, which had been purchased with Reid's credit card, revealed that both men had stayed in Fort Lauderdale only one day. According to the agent's testimony, the men appeared nervous during this encounter. The agent then asked the men if they would agree to return to the terminal and to consent to a search of their persons and their shoulder bags. The agent testified that Reid nodded his head affirmatively, and that the other man responded, "yeah, okay." As the three men reentered the terminal, however, Reid began to run. Before he was apprehended, he abandoned his shoulder bag. The bag, when recovered, was found to contain cocaine.

The Court unanimously found the stop unconstitutional:

"The appellate court's conclusion in this case that the DEA agent reasonably suspected the petitioner of wrongdoing rested on the fact that the petitioner appeared to the agent to fit the so-called 'drug courier profile,' a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics. Specifically, the court thought it relevant that (1) the petitioner had

arrived from Fort Lauderdale, which the agent testified is a principal place of origin of cocaine sold elsewhere in the country, (2) the petitioner arrived in the early morning, when law enforcement activity is diminished, (3) he and his companion appeared to the agent to be trying to conceal the fact that they were traveling together, and (4) they apparently had no luggage other than their shoulder bags.

"We conclude that the agent could not as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances. Of the evidence relied on, only the fact that the petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse relates to their particular conduct. The other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure."

*Reid*, 448 US at 440-41.

In finding the stop unconstitutional, *Reid* supplied the definition of "profile" information used by courts and commentators to this day. Profile information is not focused on a suspect's conduct, but on the confluence of a series of characteristics and circumstances believed common to those engaged in criminal activity, but that could also encompass innocent persons. *See Florida v. Royer*, 460 US 491, 494 n 2, 103 S Ct 1319, 75 L Ed 2d 229 (1983) ("The 'drug courier profile' is an abstract of characteristics found to be typical of persons transporting illegal drugs."); Joseph P. D'Ambrosio, *The Drug Courier Profile and Airport Stops: Reasonable Intrusions or Suspicionless Seizures?*, 12 Nova L Rev 273, 275 (1987) (noting that drug courier profiles are informal compilations of characteristics thought common to persons transporting narcotics).

Nine years later, the Court revisited the issue of the drug courier profile. DEA agents stopped the defendant, Sokolow, as he arrived at the Honolulu International Airport, after the agents concluded that Sokolow's behavior "had all the classic aspects of a drug courier." *United States v. Sokolow*, 490 US 1, 109 S Ct 1581, 104 L Ed 2d 1 (1989). As the Ninth Circuit described:

"The agents knew only the following facts matching their 'drug courier profile' when they first approached Sokolow: (1) that Sokolow had just returned from a three-day trip to Miami, a well-known source city for drugs; (2) that Sokolow had paid for his tickets out of a large wad of $20 bills; (3) that neither Sokolow nor Norian checked any luggage; (4) that Sokolow changed planes en route to Hawaii; (5) that Sokolow dressed in a black jumpsuit and wore a lot of gold jewelry; and (6) that Sokolow had his voice on an answering machine at a phone subscribed to by Karl Herman but told the airline his name was Andrew Kray."

*United States v. Sokolow*, 808 F2d 1366, 1370 (9th Cir 1987), *vac'd*, 831 F2d 1413 (9th Cir 1987), *rev'd*, 490 US 1, 109 S Ct 1581, 104 L Ed 2d 1 (1989).

Applying *Reid*, the Ninth Circuit held that the stop was unconstitutional because it was based on the profile factors that would apply to a large segment of innocent persons:

"The only remaining grounds for the seizure were that Sokolow had taken only carry-on bags on a three-day trip to Miami, changing planes on the way back and buying his tickets in cash. These facts can be broken down into two types: those that clearly 'describe a very large category of presumably innocent travelers' and those that arguably relate to the 'particular conduct' of the defendant. * * * Under *Reid*, 'the most general of [courier profile] characteristics cannot support a *Terry* stop without more particularized evidence of suspicious activity.' * * * We conclude that arriving on a connecting flight from a three-day trip to Miami with only carry-on luggage—facts (1), (3) & (4)—are also the type of general characteristics shared by a large category of innocent travelers that cannot support a *Terry* stop absent particularized evidence of criminal activity."

*Sokolow*, 808 F2d at 1371.

The Supreme Court disagreed, reversing course from *Reid* and holding that profile information could establish reasonable suspicion such as to justify a stop under the Fourth Amendment. *Sokolow*, 490 US at 9. The majority held:

"Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel.

But we think taken together they amount to reasonable suspicion. * * *

"We do not agree with respondent that our analysis is somehow changed by the agents' belief that his behavior was consistent with one of the DEA's 'drug courier profiles.' * * * A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a 'profile' does not somehow detract from their evidentiary significance as seen by a trained agent."

*Sokolow*, 490 US at 9-10.

Justice Marshall, joined by Justice Brennan, dissented, viewing *Sokolow* as materially indistinguishable from *Reid*:

"That the factors comprising the drug courier profile relied on in this case are especially dubious indices of ongoing criminal activity is underscored by *Reid v. Georgia*, * * * a strikingly similar case. * * *

"[The *Reid* facts], we held, [were] inadequate to support a finding of reasonable suspicion. All but the last of these facts, we observed, 'describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure.' * * *

"The facts known to the DEA agents at the time they detained the traveler in this case are scarcely more suggestive of ongoing criminal activity than those in *Reid*."

*Sokolow*, 490 US at 14-15 (Marshall, J., dissenting).

The dissent warned against the risks of departing from *Reid*, concluding that profile justification for stops risked citizens being "subjected to 'overbearing or harassing' police conduct carried out solely on the basis of imprecise stereotypes of what criminals look like, or on the basis of irrelevant personal characteristics such as race." *Id.* at 13. The dissent pointed out that "[r]eflexive reliance on a profile of drug courier characteristics runs a far greater risk than does ordinary, case-by-case police work of subjecting innocent individuals to unwarranted police harassment and

detention. This risk is enhanced by the profile's 'chameleon-like way of adapting to any particular set of observations.'" *Id.* at 13.

Turning back to the analysis required by Article I, section 9, our state constitutional approach differs markedly from *Sokolow* and the standard for reasonable suspicion under the Fourth Amendment. We have held that, under our state constitution, "[p]eople are entitled to be evaluated on their individual behavior, not that of groups to which they may belong." *State v. Baldwin*, 76 Or App 723, 729, 712 P2d 120 (1985), *rev den*, 301 Or 193 (1986). In reaching that conclusion we cited, with approval, the reasoning of *Reid*. *Id.*; *see also State v. Martin*, 260 Or App 461, 469, 317 P3d 408 (2014) ("The officer's suspicion must be particularized to the person and based on the person's conduct." (Citing *Miglavs*, 337 Or at 12.)); *accord State v. Pichardo*, 360 Or 754, 760, 388 P3d 320 (2017) (holding that, even when something less than reasonable suspicion of criminal activity is required to show that a request for consent to search is related to the stop, "the state must be able to point to a 'reasonable, circumstance-specific' relationship between the inquiry and the purpose of the detention").

We have discussed reasonable suspicion in the context of drug corridors, and profiling-based stops, on multiple occasions. In *State v. Maciel*, 254 Or App 530, 538-39, 295 P3d 145 (2013), the state proffered a series of drug corridor factors to establish reasonable suspicion, three of which (passage from California on I-5, lack of visible luggage, and dishonest explanations about the circumstances) are identical to factors relied upon by the trooper in this case:

> "Those 'indicators,' as [the officer] identified them, were (1) the California license plates of the vehicle and its passage northbound on I-5 at 4:00 a.m., (2) the third-party registration of the vehicle, (3) the existence of identical prepaid cellular phones in the vehicle, (4) the religious medallion affixed to the rearview mirror of the vehicle, and (5) the lack of visible luggage in the passenger compartment of the vehicle. In addition, [the officer] noted that defendant had immediately offered inconsistent explanations about the ownership of the car."

254 Or App at 538. We held that those factors did not create reasonable suspicion of drug trafficking:

> "[The officer's] remaining 'indicators' each carry little weight in establishing reasonable suspicion. As to the first indicator, [he] did not explain the significance of the vehicle's California license plates or its presence on I-5—aside from acknowledging that I-5 is a road regularly used for narcotics trafficking—at the suppression hearing. Similarly, with regard to the second indicator, [the officer] testified that 'often people engaging in criminal enterprises will use a third-party vehicle to help them distance themselves from whatever contraband *** may be in the vehicle.' Finally, with regard to the third indicator, [the officer] testified that, based on his training and experience, he knew that 'often drug dealers [and] people engaging in different criminal enterprises use those types of phone[s,]' *viz*., prepaid cellular phones, because they are difficult to trace. However, [the officer] acknowledged that he knew of no restrictions on the purchase or use of prepaid cellular phones and that they can be lawfully acquired with ease—by criminals and noncriminals alike.

> "To the extent that [the officer] associated those facts with drug trafficking—or other, unspecified criminal conduct—they were insufficient to establish a reasonable suspicion of that criminal activity."

254 Or App at 538-39.

More recently, in *State v. Tapp*, 284 Or App 583, 588-89, 393 P3d 262 (2017), we specifically addressed the weight accorded to the location of a stop being a "drug corridor." At the time that the officer in *Tapp* extended the traffic stop to investigate drug trafficking, he knew that the defendant was driving on a suspended license on an interstate highway in a messy car, with his mother driving behind him; that defendant was nervous to talk to him; and that defendant's mother appeared to deliberately weave her car when the officer first started following them, which might have been an effort to alert the defendant to the police presence—something that could have been "baiting activity" to distract the officer from the defendant. We held that the facts did not make it reasonable to assume that the conduct

was drug trafficking, despite occurring on a highway characterized by the officer as a "drug trafficking corridor":

> "None of that information, without more, made it objectively reasonable to think that defendant might have been trafficking drugs (which could be why [the officer] kept clarifying that his suspicion was of 'criminal activity,' not drug trafficking). Although [the officer] characterized Highway 20 as a 'drug trafficking corridor,' there is no indication that that interstate highway has fallen so out of favor with travelers not trafficking in drugs that it would be reasonable to infer that a person is a drug trafficker simply from his use of the highway."

*Id.* at 588-89.

In light of our precedent, four of the factors identified by the trooper in this case are entitled to very little weight, individually and in combination: his observation that there was nothing in the passenger compartment of the vehicle to suggest a long trip; that they made the trip down and back on I-5; that they were traveling in a rental car; and that their destination was northern California. Those factors are unremarkable and sweep up an impermissibly broad segment of the population to constitute the particularized suspicion of a specific crime that is required under Oregon law.[4]

The question is whether the additional facts known to the trooper are enough to change the calculus. As noted earlier, one of those factors—the smell of marijuana—generally no longer has the significance it once had as a basis for reasonable suspicion, in light of decriminalization. As the legal status of cannabis in Oregon has changed, so too does the

---

[4] Analogously, we have repeatedly held that observations of a suspect going to, or coming from, a known drug house, or their presence in a high crime area bear minimal weight in a reasonable suspicion analysis. *See, e.g.*, *State v. Westcott*, 282 Or App 614, 619, 385 P3d 1268 (2016), *rev den*, 361 Or 486 (2017) ("Nor is it particularly significant in the abstract that defendant had recently left a location known for drug sales."); *State v. Barber*, 279 Or App 84, 95, 379 P3d 651 (2016) ("The fact that defendant and his companion were staying at the motel, which Morrison knew to be a frequent site of drug activity, contributes only minimally to our analysis."); *State v. Wiggins*, 262 Or App 351, 361, 324 P3d 626 (2014) ("As an initial matter, two of those circumstances—*viz.*, defendant's presence in a 'high drug trafficking and use area of the city' and her 'admissions' to prior drug use months before the stop—carry minimal weight.").

role that the odor of marijuana plays in the reasonable suspicion calculus. As the trooper testified in this case, a strong odor can signal the presence of marijuana, but not necessarily the presence in a quantity that is illegal for persons 21 and older to lawfully possess. For that reason, odor adds only that much to the calculus—that some amount of marijuana may be present.

However, the statute for which the trooper had subjective reasonable suspicion in this case—ORS 475B.227(2)—is one of the only remaining statutes in Oregon, post-decriminalization, that is not dependent on a specific quantity of marijuana to establish unlawful activity. Thus, while an odor of marijuana may say very little as to whether an individual is engaged in the unlawful possession or delivery of marijuana generally, odor carries at least some import for evaluating reasonable suspicion of a violation of ORS 475B.227(2).

For purposes of reasonable suspicion of a violation of ORS 475B.227(2), however, odor was not the only additional fact in this case. There was another set of circumstances known to the trooper: From the rental agreement, it appeared that the car had been rented less than 24 hours earlier at the Portland airport; that the vehicle's occupants had made a roundtrip to Redding, California—approximately seven hours each direction—in the same day; and that the driver had attempted to conceal how long they had been in Redding. Although there was nothing illegal about that travel pattern, it was an unusually quick roundtrip. And, the driver's story about when they had left Redding was not simply implausible or suspicious; rather, it was an attempt to conceal how unusual the travel pattern was. *Cf. Maciel*, 254 Or App at 541-42 ("no connection was offered between defendant's bizarre story and the crime of drug trafficking").

This is a close case. However, we conclude that those additional circumstances, *in combination with* the presence of marijuana and what the trooper knew, from his training and experience, about the use of rental cars to traffic drugs along the I-5 corridor, were enough to give rise to a reasonable inference that the vehicle was being used for drug trafficking. And, under those circumstances, it was reasonable

for the trooper to suspect that all of the vehicle's occupants had made the trip down and back together and were involved in the trafficking operation.

In sum, it is the unusual travel pattern and the driver's effort to conceal it that distinguishes this case from others, like *Maciel*, in which the state failed to show anything more than speculation based on "indicators" that were broadly applicable to drug traffickers and innocent travelers alike. When those facts are added to the mix, the trooper's suspicion crosses from purely speculative to reasonable. For that reason, we conclude that the trooper's drug investigation of the driver and youth was supported by reasonable suspicion.

### 3. *Probable cause*

Youth also argues that, even if the questioning of the driver and youth were lawful, the trooper lacked probable cause to search the vehicle. He argues that the facts just discussed, plus the smell of the air freshener or cologne that wafted out of the car when the driver got out, were not enough to meet that higher standard. But, as the state points out, there was another fact known to the trooper by the time he searched the vehicle (in addition to inconsistent stories among the vehicle occupants about their trip): the driver had admitted that he brought an ounce of marijuana with him from California, which the trooper knew to be a crime under ORS 475B.227(2). In light of the driver's admission, the trooper had probable cause to search the vehicle for evidence of that crime under the automobile exception to the warrant requirement. *State v. Bliss*, 363 Or 426, 438, 423 P3d 53 (2018) (for that exception to apply, "(1) the car must have been mobile at the time it was lawfully stopped by the police; and (2) the police had probable cause to believe that the car contained contraband or crime evidence at the time of the search").

### B. *Fourth Amendment*

"Unlike our analysis of traffic stops under Article I, section 9, under the Fourth Amendment, a police officer 'effectively seizes everyone in the vehicle, the driver and all passengers' for the duration of a traffic stop." *State v.*

*Evans*, 284 Or App 806, 814, 397 P3d 42 (2017) (quoting *Arizona v. Johnson*, 555 US 323, 327, 129 S Ct 781, 172 L Ed 2d 694 (2009)). "Reasonable suspicion" under the Fourth Amendment "entails a minimal level of objective justification for making a stop." *State v. Wiseman*, 245 Or App 136, 140, 261 P3d 76 (2011). An officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 US 1, 21, 88 S Ct 1868, 20 L Ed 2d 889 (1968); *see also Sokolow*, 490 US at 7.

In reviewing whether the officer had reasonable suspicion, the court looks at the totality of the circumstances, giving due weight to the factual inferences drawn by the officer and the trial court judge. *United States v. Arvizu*, 534 US 266, 277, 122 S Ct 744, 151 L Ed 2d 740 (2002). Even if each fact standing alone might be consistent with innocent activity, the factors can form reasonable suspicion when viewed together. *Sokolow*, 490 US at 9.

As discussed above, the Fourth Amendment standard for reasonable suspicion of drug trafficking is, if anything, less protective of youth's rights than Article I, section 9. 308 Or App at 431-34 (contrasting the standard under *Sokolow*). For the reasons set out in our analysis of reasonable suspicion under Article I, section 9, we conclude that, for purposes of the Fourth Amendment, the trooper lawfully extended the traffic stop based on reasonable suspicion that the vehicle was being used to import marijuana to Oregon.

We reach the same conclusion with respect to probable cause that we reached under the state constitution. *See United States v. Ross*, 456 US 798, 823, 102 S Ct 2157 (1982) ("[A]n individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband.").

### III.   CONCLUSION

In this case, the trooper formed a subjective reasonable suspicion of a specific drug offense—the interstate transport of marijuana, ORS 475B.227(2). Although that reasonable suspicion was based, in part, on profiling information that carries minimal weight in establishing reasonable

suspicion for purposes of the Oregon Constitution, it was accompanied by other nonprofiling facts. The odor of marijuana, while contributing little to the reasonable suspicion analysis for general crimes of possession or delivery of marijuana, in the wake of Oregon's decriminalization of cannabis, is more probative in relation to the interstate import and export statute, which is not limited by quantity. Although close, those facts, in combination with the driver's attempt to conceal their travel pattern, established that the trooper's subjective reasonable suspicion of ORS 475B.227(2) was objectively reasonable.

Affirmed.